PRINCELLA HILL, Plaintiff-Appellee, v. CHARLIE CLUB, INC., *et al.*, Defendants-Appellants (Vavrus and Associates, Defendant).

First District (1st Division)    No. 1—94—4104

Opinion filed March 29, 1996.—Rehearing denied May 16, 1996.

Pamela Davis Gorcowski and Thomas Feehan, both of Rooks, Pitts & Poust, of Joliet, for appellants.

Harvey J. Barnett, of Barnett, Bornstein & Blazer, Ltd., of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

On October 15, 1987, Princella Hill was sexually assaulted in a conference room at the Charlie Club.

The Charlie Club was a hotel, restaurant, and health club complex located on Michigan Avenue in Chicago. Princella Hill (Hill) brought this action against the Charlie Club, Inc., and its owner, Charles Vavrus, for damages alleged to have been caused by the defendants' negligence in failing to protect her from the criminal conduct of a third party.

The jury returned a verdict for the plaintiff. The jury found plaintiff's total damages to be $350,875 and her contributory negligence to be 15%, resulting in a verdict of $298,243.75. The trial court entered judgment on the verdict. We reverse that judgment because we believe, under the circumstances of this case, the Charlie Club did not owe a legal duty to Princella Hill.

FACTS

We set out those facts that bear on the issue of whether any legal duty was owed to Princella Hill by the defendants.

Thomas Strom (Strom) testified for the plaintiff. In 1987 he was a detective with the Chicago police department. He was working on the hotel detail. Part of his job was to meet with security directors or managers of Loop hotels. He met with each hotel every 1 to 1½ weeks and provided information to the hotels regarding known offenders or suspicious people.

Detective Strom was familiar with the Charlie Club. He was also familiar with Emmitt Perine (Perine), a notorious hotel offender. Perine was constantly sought by the Chicago police department. Perine would usually pose as a photographer for a magazine or a modeling agency. He would enter a hotel and bring a woman into an empty conference room or meeting room. Perine would then commit a sex offense or a theft. Perine had done this in numerous hotels and had been caught from time to time.

Strom testified that he met with a representative of the Charlie Club, either the comptroller or assistant manager, one to two weeks after it opened in 1986. The director of hotel security was presented with a package of 10 to 12 photos, which included Perine and others who committed crimes on hotel properties. The police discussed Perine's methods, including Perine's use of open meeting rooms. The police requested the security department be given this information. The Charlie Club did not have a security department. Other hotels, like the Blackstone or Continental, did. The police asked that the housekeeping staff, front desk personnel, bellman, and doorman all familiarize themselves with the pictures. The majority of hotels had security offices wherein they hung the mug shots on boards along with their descriptions and *modus operandi.*

Strom met with the Charlie Club hotel manager every 10 days. He would review security issues. Perine's name would come up from time to time, as well as the names of other offenders. The detective also held monthly meetings to which the hotels were invited. Additional information and photographs were provided at these meetings. In Strom's opinion, Charlie Club did not have adequate security because it had no security. Security would have made sure the meeting room doors were locked and would have served as a deterrent.

On cross-examination, Strom agreed that it is not a standard that hotels have security. He also agreed that all hotels have unlocked meeting rooms from time to time. He was unaware of any prior crimes at the Charlie Club premises other than thefts.

Charles Vavrus (Vavrus) testified as an adverse witness. He

owned 100% of the stock of the Charlie Club. The hotel had 137 rooms, a health club, and a dining room. Advertisements promoted the health club as open 24 hours a day. The dining room was open to the public. Hotel guests were allowed free use of the health club. The Charlie Club sold memberships which entitled members to use the health facilities. The public was encouraged to come to the Charlie Club.

Conference rooms were to be locked when not in use. Members of the public were not invited into closed conference rooms. In order to use a conference room, a guest would have to make arrangements with the hotel and pay a fee. There had been no serious crimes committed at the Charlie Club on Michigan Avenue before this incident. The bars were not open in October 1987. The hotel never sold champagne by the bottle. Vavrus considered everyone, *i.e.*, the bellman, housekeeping, and maintenance, to be security.

Johnnie Farr (Farr) testified that she had been employed as the membership secretary at the Charlie Club from December 1985 to February 1988. At least once a week, the club was short-staffed and she worked at the front desk. Farr was neither provided photographs nor told about notorious hotel offenders. She never received any training or instruction regarding security. She was never told that she was considered to be security.

Farr had seen Perine in the club several times before October 1987. On October 15, 1987, Farr saw plaintiff enter the hotel, accompanied by Perine. Later, plaintiff exited the elevator screaming she had been raped.

Princella Hill testified that before the rape she was friendly, outgoing, responsible, and overall a nice person. She was a casual acquaintance of Perine. She had worked with Perine at a previous job. On October 15, 1987, Hill saw Perine on the street. They stopped to talk. Perine was nicely dressed. He was wearing a business suit and carrying a briefcase. Perine invited Hill to attend a conference with him at the Charlie Club. Hill agreed to accompany him.

Although Hill was not a member of the Charlie Club, she had been to the club approximately four times before. She had attended social gatherings sponsored by a radio station. Hill was aware that members of the public could go into the Charlie Club.

Hill and Perine entered the Charlie Club, went upstairs on the elevators, and then to a conference room. Perine opened the door to an empty conference room. Hill questioned Perine regarding where the other members of the conference were. Hill and Perine sat at the table and talked. Perine left to get champagne. He returned 20 minutes later. They talked and drank the bottle of champagne. Hill

left to make a phone call and returned. Perine left to get another bottle of champagne. He was gone for 10 to 15 minutes. When Perine returned, they talked and poured more champagne. Hill decided to leave. Perine grabbed her, struck her, choked her, and raped her. Hill put her clothes back on and went down to the reception desk. She said she had been raped.

Scott Schippel was called as a witness by the defense. Schippel was the only comptroller at the Charlie Club in 1987. He was the only male in the corporate offices. He never met Detective Strom. He was never given any pictures by the Chicago police department regarding hotel criminals.

The parties stipulated that Emmitt Perine pleaded guilty to two counts of aggravated criminal sexual assault on Princella Hill and was sentenced to prison.

OPINION

The threshold issue, and one we find dispositive in this case, is whether the Charlie Club owed a legal duty to Princella Hill. Absent that duty, there can be no recovery. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 531 N.E.2d 1358 (1988). Whether a legal duty exists is a question of law. To answer the question, courts determine whether there is a relationship between the parties "which requires the imposition of a legal obligation upon one party for the benefit of another." *Lutz v. Goodlife Entertainment, Inc.*, 208 Ill. App. 3d 565, 568, 567 N.E.2d 477 (1990).

This case requires an inquiry into the area of Illinois law that deals with a landowner's legal obligation to protect others from criminal acts by third persons. Generally, no such duty exists. *Jackson v. Shell Oil Co.*, 272 Ill. App. 3d 542, 547, 650 N.E.2d 652 (1995).

There is a way to establish an exception to the general no-duty rule.

First, the court must find there is a special relationship between the injured person and the landowner. *Jackson v. Shell Oil Co.*, 272 Ill. App. 3d at 547.

Second, the court engages in an analysis that combines the question of whether the criminal attack was reasonably foreseeable with "various policy considerations." *Davis v. Allhands*, 268 Ill. App. 3d 143, 151, 643 N.E.2d 856 (1994).

Those "policy considerations" require a court to consider the likelihood of injury, the magnitude of the burden to the defendant of guarding against the injury, and the consequences of placing the burden on the defendant. *Lutz v. Goodlife Entertainment, Inc.*, 208 Ill. App. 3d at 569. We are instructed not to determine the presence

of a legal duty solely on the existence of foreseeability. "Instead, we must balance the foreseeability of the harm against the burdens and consequences that would result from the recognition of a duty." *Hutchings v. Bauer*, 149 Ill. 2d 568, 571, 599 N.E.2d 934 (1992).

Our supreme court has embraced Dean Prosser's view of whether a duty should exist: "[It] should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Keeton, Prosser & Keeton on Torts § 54, at 358 (5th ed. 1984), cited in *Rowe v. State Bank of Lombard*, 125 Ill. 2d at 215-16.

The idea that duty should not be defined only by notions of reasonable foreseeability makes especially good sense when we inquire into the responsibility of a landowner for the criminal conduct of another.

Hindsight is easy. The firefly is one of the few creatures, human or otherwise, that carries its illumination behind it. "Everyone can foresee the commission of a crime virtually anywhere at any time. *** The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it." (Emphasis in original.) *Bence v. Crawford Savings & Loan Ass'n*, 80 Ill. App. 3d 491, 495, 400 N.E.2d 39 (1980).

With these principles in mind, we turn to the facts of this case.

First, we determine whether there was a special relationship between Princella Hill and the Charlie Club.

■ The plaintiff contends she was a business invitee of the Charlie Club, the only conceivable way she would qualify for the "special relationship" required by the decisions.

A person is a business invitee on the land of another if (1) the person enters by express or implied invitation; (2) the entry is connected with the owner's business or with an activity conducted by the owner on the land; and (3) the owner receives a benefit. *Leonardi v. Bradley University*, 253 Ill. App. 3d 685, 690, 625 N.E.2d 431 (1994).

Princella Hill entered the hotel with Emmitt Perine after meeting him on the street. They went to an unused conference room. They drank from a bottle of champagne. The hotel never sold champagne by the bottle.

We do not see how the Charlie Club received any benefit from the presence of Princella Hill. That means Princella Hill was not a business invitee. Failure to establish the business invitee-invitor relationship is fatal to the plaintiff's claim of legal duty in a case involving criminal conduct by a third person. See *Jackson v. Shell Oil Co.*, 272 Ill. App. 3d at 548.

Even if it could be said Princella Hill was Charlie Club's invitee, we do not find the presence of a legal duty.

Charlie Club had 137 hotel rooms, a restaurant, and a health club. Before the attack on Princella Hill, the Club had not had any violent crimes on its premises. Perine had been in the club before the attack, without incident. So had Princella Hill. Detective Strom testified Perine usually posed as a photographer. Perine was not posing as a photographer when he met Princella Hill on the night of October 15, 1987.

The "foreseeability" that we inquire into is something that "is objectively reasonable to expect, not merely what might conceivably occur." *Benner v. Bell*, 236 Ill. App. 3d 761, 766, 602 N.E.2d 896 (1992). It must be judged by what was apparent to the defendant at the time of the attack on Princella Hill, "and not by what may appear through hindsight." *Lewis v. Razzberries, Inc.*, 222 Ill. App. 3d 843, 851, 584 N.E.2d 437 (1991).

It is true that Perine was one of 10 or 12 known hotel offenders some employees of the Club, but not the clerk on duty on October 15, 1987, had been informed about. We do not believe it is fair or reasonable to impose on a hotel the duty to conduct an investigation to discover every known offender who might enter the premises.

The "burdens and consequences" that would result from imposition of a duty under these circumstances would be onerous. See *Hutchings v. Bauer*, 149 Ill. 2d at 571. The hotel would be required to police all areas of its premises. Hotel staffs would be required to recognize and do something about any number of potential offenders, each of whom could have a different *modus operandi*. Perine chose to commit his crimes in empty meeting rooms. Another offender might choose the stairwell, the elevator, or the public washroom.

No Illinois case has gone that far in creating a legal duty on a landowner in third-party criminal conduct situations. There are no circumstances here "such as prior incidents [that] charge the owner or occupier of land with knowledge of the danger." *Lutz v. Goodlife Entertainment, Inc.*, 208 Ill. App. 3d at 570-71. That is, "actual knowledge." *Davis v. Allhands*, 268 Ill. App. 3d at 152.

Considering the undisputed facts in this case, we conclude as a matter of law that these defendants should not be held responsible in damages for whatever consequences might have resulted from their actions or their lack of actions on October 15, 1987.

The plaintiff has suggested as an alternative ground for support of her judgment that the Charlie Club was guilty of wilful and wanton conduct. There is no evidence of wilful and wanton conduct on the part of the defendants in this case.

CONCLUSION

For the reasons stated in this opinion, we reverse the judgment of the trial court and enter judgment on behalf of the defendants.

Reversed.

CAMPBELL, P.J., and BUCKLEY, J., concur.