(Nos. 87895, 87910 cons

JOHN HILLS *et al.*, Appellees, v. BRIDGEVIEW
LITTLE LEAGUE ASSOCIATION *et al.*, Appel-
lants.

*Opinion filed November 16, 2000.—Rehearing denied
April 2, 2001.*

HARRISON, C.J., dissenting.

Michael Resis and James W. Fessler, of O'Hagan, Smith & Amundsen, LLC, of Chicago, for appellant Bridgeview Little League Association.

Thomas J. O'Brien, John E. Rodewald and Mark G. Sheridan, of Meckler, Bulger & Tilson, of Chicago, for appellant Justice Willow Springs Little League.

James H. Wolf and James M. Wolf, of Wolf & Tennant, of Chicago, for appellees.

Kilgallon & Carlson, of Chicago (Michael B. Kilgallon, of counsel), for *amicus curiae* Little League, Inc.

Bruce R. Pfaff, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE McMORROW delivered the opinion of the court:

On July 30, 1990, plaintiff John Hills was attacked and beaten while coaching first base for a Little League baseball team. His attackers, Ted Loy, George Loy, Sr., and George Loy, Jr., were, respectively, the manager and assistant coaches for the opposing team, which was sponsored by defendant Bridgeview Little League Association (Bridgeview). The attack occurred during a Little League baseball tournament hosted by defendant Justice Willow Springs Little League (Justice).

After the attack, John Hills and his wife, plaintiff Patricia Hills, sued the Loys in the circuit court of Cook County, seeking damages for John Hills' personal injuries and for Patricia Hills' loss of consortium. Plaintiffs also sued Bridgeview and Justice, alleging that Bridgeview negligently failed to supervise and control the Loys, and

that Justice negligently failed to protect John Hills from the attack. The Loys defaulted.[1] A jury found against Bridgeview and Justice, apportioning fault pursuant to section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1994)) equally between the two. The trial judge did not permit the jury to include the Loys in the apportionment of fault. The appellate court affirmed the judgment of the circuit court. 306 Ill. App. 3d 13. We granted Bridgeview's and Justice's petitions for leave to appeal and consolidated the cases for review.

## BACKGROUND

At trial, John Hills testified that, in the summer of 1990, he was the first base coach on an all-star Little League baseball team sponsored by the Lemont Little League Association. The players on the team were 14-year-olds. In July 1990, the Lemont team entered a Little League baseball tournament sponsored by Justice. To enter the tournament, the Lemont team payed a fee of $125 and posted a surety bond. The entrance fee was paid by the Lemont team's manager, Ray Chadorowski.

On July 30, 1990, as part of the regular tournament schedule, the Lemont team played a game against an all-star Little League team sponsored by Bridgeview. According to Hills, approximately 40 people were in attendance at the game. Hills stated that the Lemont and Bridgeview teams had played each other earlier in the tournament without incident and that, prior to July 30, he had never heard anything negative about the Bridge-view coaches or manager. Hills exchanged "hellos" in the parking lot with the manager of the Bridgeview team, Ted Loy, before the game began. As the teams took the field, Hills sensed no problems with anyone's behavior

---

[1]The Loys took no action to challenge the default judgment in the circuit court, were not parties before the appellate court and are not involved in this appeal.

and had no indication that anything was out of the ordinary.

The playing field on which the July 30 game was held was one of two adjacent baseball fields located in the middle of a residential neighborhood in Willow Springs. The playing field was completely surrounded by a chain link fence approximately six feet high. Behind home plate, the fence rose higher, forming a protective backstop. Behind this backstop was an elevated booth or platform with a small public address system. An announcer sat in this booth during the game.

The areas where the teams sat during the games, the dugouts, were inside the fence that surrounded the field and were themselves protected by chain link fencing. The dugout on the first base side of the field had one opening that was approximately 10 feet from first base. During the game, the Bridgeview team occupied the first base dugout and the Lemont team occupied the dugout near third base. While their respective teams were batting, the first base coaches from each team stood in a designated area between first base and the Bridgeview dugout known as the coach's box and directed the players who safely reached first base to stop or to keep running. Bridgeview's first base coach was Ted Loy's nephew, 16-year-old George Loy, Jr.

Hills testified that, during the first inning, in an attempt to influence the first base umpire's calls, George Loy, Jr., began gesturing and yelling "safe, safe, safe" as the Bridgeview players crossed first base. The Lemont team called time-out. A conference was held among the home plate umpire, Scott Van Wagner, the first base umpire, Ed Jalovec, and the Bridgeview and Justice managers and coaches. During the conference, Van Wagner told the Bridgeview coaches to stop trying to influence the first base umpire's calls. Play resumed.

Hills testified that nothing unusual happened during

the second inning. However, during the third or fourth inning, while Hills was in the coach's box at first base, Bridgeview assistant coach George Loy, Sr., began shouting at Hills from the Bridgeview dugout. According to Hills, George Loy, Sr., began yelling such things as "Hey you four eyed M-Fer, I'm going to kick your ass." Hills, who was facing the playing field, turned around and said, "What did you say?" Loy said, "You heard me," and began swearing again. Hills stated that he asked Loy, "For what?" Loy replied, "For what happened earlier in the first inning." Hills said, "You got to be kidding," and told Loy to "Forget about it, leave it go, it's only a kid's game, let it lie." Loy responded, "No way, I'm coming after you." According to Hills, Loy repeated similar statements at least four or five times during the third and fourth innings. Prior to the fifth inning, Hills told Ray Chadorowski and Harry Keeler, Lemont's third base coach, that George Loy, Sr., was yelling and swearing at him. Keeler asked Hills if he wanted to continue coaching first base. Hills said that he did.

During the fifth inning, George Loy, Sr., again swore at Hills. Hills ignored Loy and did not turn around. During the sixth inning, Hills' team scored several runs and took the lead in the game. Loy continued swearing, but he was now angrier and his voice was louder. Hills stated that, during this time, anyone who was in the Bridgeview dugout would have heard the swearing and shouting. Hills also stated that the first base umpire, who was standing in the field between first and second base, would have been able to hear the swearing. Hills stated that neither the first base umpire nor the Bridgeview manager, Ted Loy, told George Loy, Sr., to stop yelling and swearing. Hills acknowledged, however, that he never complained to Ted Loy, the first base umpire, or the home plate umpire about George Sr.'s behavior. Hills further stated that, despite the shouting and swearing, he was

not nervous, he never thought that George Loy, Sr., was going to come out of the dugout and attack him, and that he "didn't really feel threatened at all."

At the end of the sixth inning, Hills bent down to pick up a scorebook that he had set on the ground near first base. Hills testified that, while he was bent over, he was suddenly hit in the back of the head and knocked to the ground on his hands and knees. Unable to see his attackers, Hills was then punched in the face and hit several times in the side and back. Hills struggled to get up and was again hit in the face and side. As Hills got to his feet, he was punched again. Hills stated that, at this point, he saw both George Loy, Sr., and George Loy, Jr., attacking him. George Loy, Jr., then dug his thumb into Hills' eye and tried to rip it out. After Hills was punched again in the body and face, there was a "lull" in the attack.

Hills testified that, during the "lull," he staggered in the direction of the fence that surrounded the playing field. He then saw George Loy, Sr., rushing toward him. Hills tried to protect himself but was unable to prevent Loy from punching him in the face and breaking his nose. George Loy, Sr., then punched Hills a couple more times. After this, there was another "lull" in the attack.

Hills stated that he was in a daze and was feeling his broken nose when he heard someone yell, "Oh, my God, look out, he's got a bat." Hills then saw, out of the corner of his eye, George Loy, Jr., swinging a baseball bat at his knees. Hills said that he was able to sidestep the blow so that the bat struck him on the inner side of the left knee. Hills then fell to the ground. Hills stated that the next thing he remembered was John O'Neill, a parent of one of the Lemont players, telling him to stay down and not to move. Hills could not recall being taken to the hospital or being treated in the emergency room. As a result of the attack, Hills suffered serious injuries and was hospitalized for five days.

Patricia Hills, John Hills' wife, testified that she attended the game between Bridgeview and Lemont with her nephew, Michael Putrow, and her mother, Clare Masterson. Patricia sat in the bleachers near the Lemont team, on the third base side of the playing field. Patricia estimated that approximately 20 people were seated in the Lemont bleachers. Patricia testified that the Lemont team had participated in a tournament sponsored by Justice in 1989 without incident. Patricia further stated that, prior to the game on July 30, 1990, she had not heard anything negative about the Bridgeview manager or coaches and that she had never seen a physical fight between coaches at a Little League baseball game.

According to Patricia, nothing unusual happened during the game until the sixth inning. During the sixth inning, Patricia saw George Loy, Sr., who was yelling, quickly move four to five feet out of the Bridgeview dugout toward her husband, gesture with his hands "in a threatening manner," and then return to the dugout. Patricia stated that she saw George Loy, Sr., come out of the dugout at least four times during the sixth inning. She also saw her husband, who had his back to the Bridgeview dugout, gesture with the back of his hand to indicate "get away from me, or just like leave me alone." Unable to make out what George Loy, Sr., was yelling, Patricia told her nephew, Michael Putrow, to go over to the first base side of the field and find out what Loy was saying to her husband. Patricia stated that, despite the fact that George Loy, Sr., was yelling and gesturing, she did not believe that he was actually going to try and beat her husband.

As the sixth inning ended, Patricia saw her husband bend down to pick up his scorebook. As he did so, George Loy, Sr., left the Bridgeview dugout and knocked him down. Stunned, Patricia jumped to her feet and started running to the first base side of the field, going around

the fence that surrounded the playing area. Patricia stated that it took her 30 seconds to run from the third base bleachers to the first base side of the field. As she was running, Patricia saw George Loy, Sr., punch her husband all over his body.

When she got to the first base side of the field, Patricia stood behind the fence that surrounded the playing field and screamed for help. She saw the first base umpire, who was standing between first and second base, look at her husband and then turn and walk away. She also saw the home plate umpire and the game announcer turn and look toward her, but not respond. Patricia then saw Ted Loy, the Bridgeview manager, come out of the dugout and start beating and kicking her husband. George Loy, Jr., the first base coach for Bridgeview, then joined the attack and tried to gouge out John Hills' eye. The Bridgeview players then emptied the dugout and began milling around the Loys and John Hills.

Patricia stated that, after the attack had been going on for about three minutes, Harry Keeler, the third base coach for Lemont, came over, grabbed hold of George Loy, Sr., and pulled him away from John Hills. While Keeler was holding George Loy, Sr., there was a "lull" in the attack for approximately one minute.

Patricia stated that, during the "lull," she asked her husband if he was okay, but he was disoriented and did not respond. While still trying to get a response from her husband, Patricia noticed George Loy, Jr., sneak behind Keeler and pull Keeler's jacket up over his head, pinning Keeler's arms. George Loy, Sr., now free from Keeler's grasp, ran over to John Hills and punched him in the nose.

Patricia stated that she then saw the home plate umpire, Scott Van Wagner, trying to get the Bridgeview players under control and move them back into their dugout. Patricia estimated that six minutes passed be-

tween the time she first screamed for help and the time Van Wagner came down to the first base area. Patricia further stated that she had not heard any announcements over the public address system and did not see the first base umpire intervene in the attack in any way. After George Loy, Sr., punched John Hills five or six more times, someone other than the umpires, Patricia was not sure who, again pulled George Loy, Sr., away. There was then another "lull" in the attack of approximately a minute.

Patricia testified that, during the lull, she was screaming and watching her husband struggle to stay standing. She saw Ted Loy sneaking back into the dugout, avoiding the home plate umpire, and acting "as if he really hadn't done anything." She then saw George Loy, Jr., running toward her husband with a baseball bat. Patricia yelled, "Oh, my God, he's going to kill him now," and then screamed to her husband, "Watch out, he's got a bat." Patricia saw her husband get hit with the bat on the side of the knee and then fall to the ground. George Loy, Jr., then ran away. According to Patricia, John Hills was not beaten after he received the blow to his knee.[2] Patricia stated that, after her husband was on the ground, she started running to a concession stand, which was located behind right field, to phone for an ambulance. While she was going to get help, Patricia saw a man who said he lived "right behind the thing" and who said he would run to his house and make the call. As Patricia was returning to her husband, she heard the sirens of emergency vehicles coming to the field. Patricia stated that she was away from her husband for one or two minutes. She also stated that the police station was located within a few blocks of the playing field. No evi-

---

[2]The appellate court below stated that George Loy, Jr., "beat Hills with a baseball bat for about 10 to 15 minutes" (306 Ill. App. 3d at 16-17). This statement is incorrect.

dence was offered as to who actually phoned for the ambulance and police.

Other witnesses testified to the events surrounding the attack. Michael Putrow, plaintiffs' nephew, was 13 years old in July 1990. Putrow testified that, during the third inning, while he was sitting in the third base bleachers, he saw George Loy, Sr., come out of the dugout, yelling and waving his fist. During the sixth inning, George Loy, Sr., became more irate and came out of the dugout to within three feet of John Hills. Neither Ted Loy nor the umpires told George Loy, Sr., to stop yelling and swearing. At the end of the sixth inning, George Loy, Sr., attacked Hills from behind and began punching and kicking him. Ted Loy and George Loy, Jr., then joined in the attack. According to Putrow, the first base umpire saw the attack begin, turned, and then walked away. Also, according to Putrow, the home plate umpire did not come down to the first base area until after John Hills had been struck with the bat. Putrow stated that he saw his aunt, Patricia Hills, run to phone for an ambulance. According to Putrow, the ambulance and police arrived 20 to 25 minutes later. Putrow also stated that the entire attack, including the "lulls," lasted about 10 minutes.

Clare Masterson, Patricia Hills mother, offered testimony which generally corroborated plaintiffs' testimony. Rebecca DeVerdier, who was 15 years old at the time of the attack and who was sitting in the third base bleachers, also generally corroborated plaintiffs' testimony. DeVerdier stated that she believed the entire attack lasted from 10 to 15 minutes.

Harry Keeler, Lemont's third base coach, also testified at trial. Keeler stated that he did not hear any of the Loys say anything rude or threatening to John Hills prior to the attack. Keeler also stated that John Hills did not approach him during the game and tell him that George Loy, Sr., was shouting and swearing. Keeler was also un-

aware of anyone complaining to the umpires about George Sr.'s conduct before the attack.

Keeler testified that, when the sixth inning ended, he was walking back to the dugout on the third base side of the field when he heard one of the Lemont players say, "Look at Mr. Hills." Keeler turned around and saw George Loy, Sr., on top of John Hills, "swinging wildly." Keeler told Ray Chadorowski to "keep the kids in the dugout." Keeler then ran over to first base, tackled George Loy, Sr., grabbed him, and dragged him over to the fence that surrounded the field.

Keeler asked George Loy, Sr., what was going on and, after a few moments, asked if he had calmed down. Keeler felt Loy's body relax. Assuming that the attack was over, Keeler released Loy. Keeler stated that someone then hit him on the left side of the head. George Loy, Sr., then turned around, pulled Keeler's jacket over his head, and started punching him. Keeler stated that he somehow managed to get Loy away from him and that things then "calmed down for a second or two." Keeler then saw George Loy, Jr., hit John Hills with a baseball bat.

Keeler estimated that the entire attack on John Hills lasted between three and four minutes. He also estimated that the police arrived five to seven minutes after the attack began. Keeler stated that he did not see the umpires intervene in the attack but that he also "wasn't really paying attention to what they were doing."

Scott Van Wagner testified that he was 23 years old in the summer of 1990 and that he was the volunteer, home plate umpire for the July 30 game. Van Wagner stated that, prior to the attack, he did not notice any threats, yelling or other improper conduct by any of the coaches or players. Also, before the attack, no one complained to him about the conduct of George Loy, Sr.

Van Wagner testified that, after the sixth inning

ended, he turned around to speak to the announcer behind the home plate backstop. After a few minutes, either the announcer, or someone in the area of the announcer, said there was a fight going on. Van Wagner turned, saw what he believed to be a fight near first base, and ran down to that area. Contradicting Patricia Hills' testimony, Van Wagner stated that he grabbed George Loy, Sr., who was rolling on the ground with John Hills, picked him up, and carried him to the dugout. He also called out to other adults to phone for the police.

As soon as Van Wagner put George Loy, Sr., in the dugout, he turned around and saw George Loy, Jr., standing over John Hills with a baseball bat. Harry Keeler was also standing nearby. Van Wagner stated that he ran after George Loy, Jr., who said, "I'm done," and then threw the bat away. Van Wagner picked up George Loy, Jr., and carried him to the dugout. According to Van Wagner, the police arrived less than five minutes later.

Van Wagner stated that he did not see the first punches thrown at John Hills and did not see whether Ted Loy joined in the first part of the attack. Van Wagner also did not see Keeler grab George Loy, Sr. According to Van Wagner, if Keeler grabbed George Loy, Sr., he would have had to have done so before Van Wagner first turned around.

Larry Laduca corroborated Van Wagner's testimony about restraining George Loy, Jr., after John Hills was struck with the baseball bat. Laduca stated that he managed one of the baseball teams sponsored by the Justice Willow Springs Little League. At the time of the attack, Laduca was watching a Little League game that was taking place on the field adjacent to the Bridgeview and Lemont game. Laduca stated that, as he was watching the other game, he heard one of the "Willow Springs mothers" near the concession stand yelling that there was a fight. Laduca ran over to the field on which the

Bridgeview and Lemont game was being played and went through a gate in the outfield fence. As he reached the first base area, Laduca saw John Hills lying on the ground. He also saw Van Wagner running after George Loy, Jr., who was holding a baseball bat. Van Wagner told Laduca to "Get to the dugout and don't let anyone out." Laduca went to the dugout and saw members of the Bridgeview team crying and saying that "all they wanted to do was play baseball and we have to go and put up with this." According to Laduca, Van Wagner brought George Loy, Jr., into the Bridgeview dugout. All three Loys were then kept in the dugout until the police arrived.

Ed Jalovec, the first base umpire, testified via videotape evidence deposition. Jalovec stated that he could not recall if he had been paid to umpire the July 30 game or if he had volunteered. In contradiction to plaintiffs' witnesses, Jalovec stated that he did not see the beginning of the attack on John Hills, and that the attack was over quickly. Jalovec stated that he was facing the playing field as the inning of the attack was ending. After the last out was made, Jalovec turned toward the first base foul line. At that time, according to Jalovec, John Hills was already on the ground and the Bridgeview coaches and manager were in the Bridgeview dugout. Hills' wife and another coach from Lemont then came running over to Hills. Jalovec stated that he did not see anyone strike Hills with a bat and that he saw no further attacks on Hills after he turned toward first base.

Joseph Kalafut testified that he was the announcer and scorekeeper at the July 30 game and that he was a member of Justice's governing board. Kalafut explained that the Justice Willow Springs Little League is a nonprofit corporation with a volunteer board of 8 to 10 persons. Justice owned the playing field on which the game was held, as well as a concession stand and a second, smaller baseball field adjacent to the first.

Kalafut explained that Justice held a baseball tournament at the end of July to give some of the children additional playing experience since their regular baseball season ended in the beginning of July. The tournament also generated revenue for Justice, with money being made through the sale of concessions of food such as hot dogs and soda pop. The tournament was run by the Justice board members and parent volunteers. The $125 entrance fee charged to the teams was used to pay for trophies that each team received, for food that the players and umpires were given after the games, and possibly for the services of the umpires. Any profit left over from the entrance fee was "nominal." During a tournament, Justice would have both paid and volunteer umpires. In 1990, paid umpires received $5 to $10 a game. No admission fee was charged to people who came to watch the games.

Kalafut stated that, at the July 30 game, he was seated on the elevated announcer's platform behind the fence in back of home plate. At some point during the game, between innings, Kalafut was talking to the home plate umpire when he noticed two men near first base "engaged in a struggle of some sort." Kalafut told the umpire that he thought there was "a problem going on down there." Kalafut left the booth and immediately went down to the first base area. According to Kalafut, when he got to the first base area, John Hills was on the ground and the attack was over. Kalafut stated that he did not make any announcement to stop the fighting when he first became aware of it because he did not believe it was a "positive thing" to announce that there was a fight in front of the children and adult spectators.

Bridgeview board members Ronald Mizwicki and Gregory Klein testified regarding the Bridgeview organization and its relation to the Loys. Mizwicki stated that Bridgeview was an unincorporated, nonprofit association

whose goals were to teach its players good sportsmanship and how to play Little League baseball. The Bridgeview governing board consisted of a president, a vice-president, a secretary, a treasurer and an equipment manager. The board and team managers were volunteers. In 1990, Mizwicki was the acting president of Bridgeview. Mizwicki stated that he appointed Ted Loy to be the manager of the team that attended the July 30 game after Loy volunteered to take the position. Mizwicki also stated that, prior to appointing Ted Loy manager, he had never heard anything negative about him. Loy had managed for Bridgeview in the past without incident and, as far as Mizwicki knew, he had a good reputation in the community. Volunteer managers were difficult to find and, when Ted Loy volunteered to manage the 1990 team, Mizwicki accepted.

Mizwicki acknowledged that Ted Loy represented Bridgeview at the July 30 game, as none of the board members were in attendance. However, Ted Loy, and other team managers, did not run Bridgeview or set its policies. Mizwicki stated that Ted Loy selected George Loy, Sr., and George Loy, Jr., as his assistant coaches and that he had the authority to do so under Bridgeview's rules. Mizwicki further stated that Bridgeview managers were expected to conduct themselves properly at all games and that they were expected to supervise and control the conduct of their players and coaches during games.

Gregory Klein generally corroborated Mizwicki's testimony. Klein stated that, when the Bridgeview board learned of Ted Loy's attack on John Hills, the board barred him from the Little League. Because George Loy, Sr., and George Loy, Jr., were not members of Bridgeview, the board could not take any action against them.

Following the attack on John Hills, plaintiffs filed a complaint in the circuit court of Cook County against the

three Loys, Bridgeview and Justice. As ultimately amended, plaintiffs' complaint alleged a theory of direct negligence against Bridgeview, specifically, that Bridgeview was negligent in failing to supervise and control its coaches and manager. In addition, the complaint alleged that Justice was negligent in failing to protect John Hills from the attack. The complaint also alleged that the Loys struck and injured John Hills. On June 5, 1995, the trial court entered an order of default against the Loys for failure to answer or otherwise plead.

After the evidence at trial was heard, the jury was instructed that Ted Loy, George Loy, Sr., and George Loy, Jr., had defaulted and that all of plaintiffs' allegations had been admitted against them. The jury was also instructed on plaintiffs' theories of liability with respect to Bridgeview and Justice and was told that Bridgeview and Justice had a duty to exercise ordinary care for the safety of John Hills.

The jury returned verdicts in favor of plaintiffs, awarding John Hills $632,710 and Patricia Hills $125,000. The jury apportioned fault equally between Bridgeview and Justice pursuant to section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1994)). The trial judge did not permit the jury to include the Loys in the apportionment of fault. Thereafter, the trial judge denied Bridgeview's and Justice's motions for judgment notwithstanding the verdict or for a new trial.

On appeal, both Bridgeview and Justice challenged the findings of negligence and the trial judge's decision to exclude the Loys from the apportionment of fault. With respect to Bridgeview, the appellate court acknowledged that one generally has no duty to control the conduct of another to prevent him harming a third party, but concluded that a "special relationship" existed in the case at bar which imposed an affirmative duty upon Bridgeview to control the actions of George Loy, Sr., and

George Loy, Jr. The appellate court reasoned that Bridge-view, through the person of Ted Loy, stood in a master-servant relationship with George Loy, Sr., and George Loy, Jr., and that Bridgeview had an affirmative duty, in accordance with section 317 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 317 (1965)), to control the conduct of the assistant coaches to prevent them from intentionally harming John Hills. The appellate court concluded that this duty arose "once the beatings began and two one-minute lulls followed." 306 Ill. App. 3d at 20. The court also determined that there was sufficient evidence to show that Bridgeview, acting through Ted Loy, had breached its duty to control its servants and that this breach of duty was a proximate cause of plaintiffs' injuries.

With respect to Justice, the appellate court acknowledged that, in the absence of a special relationship, a landowner generally has no duty to protect lawful entrants from criminal attacks by third parties. The appellate court concluded, however, that Justice and John Hills stood in a special relationship of "business invitor and invitee." The appellate court further determined that the attack on John Hills was foreseeable to Justice once it "began and two one-minute breaks occurred" and that imposing a duty to protect upon Justice would not be unduly burdensome. 306 Ill. App. 3d at 22. Therefore, the appellate court concluded that Justice had a duty to protect John Hills from the Loys' attack. In addition, the appellate court determined that there was sufficient evidence to show that Justice breached its duty to protect and that this breach of duty was a proximate cause of John Hills' injuries. 306 Ill. App. 3d at 23.

The appellate court also concluded that the circuit court did not err in excluding the Loys from the apportionment of fault. The appellate court reasoned that section 2—1117 of the Code of Civil Procedure (735 ILCS

5/2—1117 (West 1994)) applies only to actions based on negligence and not those based on intentional torts. 306 Ill. App. 3d at 21. Accordingly, the appellate court held that the trial judge did not err in denying Bridgeview's and Justice's post-trial motions.

We granted Bridgeview's and Justice's petitions for leave to appeal and consolidated the cases for review. We permitted the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of plaintiffs and Little League, Inc., to file an *amicus curiae* brief in support of defendants.

## ANALYSIS

### Bridgeview Little League Association

To succeed in an action for negligence, a plaintiff must prove facts that establish the existence of a duty, a breach of the duty, and an injury to the plaintiff which was proximately caused by the breach. *Cunis v. Brennan*, 56 Ill. 2d 372, 374 (1974). Bridgeview initially contends that the circuit court erred in denying its motion for judgment notwithstanding the verdict because it did not have an affirmative duty to control any of the Loys. Whether a duty exists is a question of law. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987).

Generally, one has no affirmative duty to control the conduct of another to prevent a criminal attack on a third party. *Estate of Johnson v. Condell Memorial Hospital*, 119 Ill. 2d 496, 503 (1988); *Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 632 (1995); Restatement (Second) of Torts § 315 (1965). The common law recognizes an exception to this rule when a "special relationship" exists between the actor and the one whose conduct is to be controlled. *Estate of Johnson*, 119 Ill. 2d at 503; Restatement (Second) of Torts § 315(a) (1965). The general rule that one has no affirmative duty to control oth-

ers in the absence of a special relationship has been, and continues to be, much debated among legal commentators. See, *e.g.*, D. Dobbs, Law of Torts, ch. 21, at 854 nn.4-8 (2000) (listing representative literature discussing affirmative duties). Neither Bridgeview nor plaintiffs have asked us to abandon or modify the general, no-affirmative-duty rule or the special relationship doctrine.

Plaintiffs maintain that a relationship of master and servant existed between Bridgeview and George Loy, Sr., and George Loy, Jr. According to plaintiffs, this master-servant relationship was a special relationship which, under the theory of liability set forth in section 317 of the Restatement (Second) of Torts, imposed an affirmative duty upon Bridgeview to exercise reasonable care to control the conduct of George Loy, Sr., and George Loy, Jr., to prevent them from intentionally harming John Hills.

Section 317 provides:

"Duty of Master to Control Conduct of Servant

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 317 (1965).

Plaintiffs contend that Bridgeview falls under the rationale of section 317 based upon the following reasoning. (1) Bridgeview's manager at the July 30 game, Ted

Loy, was an agent of Bridgeview. (2) Because of the position and supervisory authority given to Ted Loy by the Bridgeview organization, he may be considered the "master" for purposes of establishing the notice and ability to control requirements of section 317. (3) George Loy, Sr., and George Loy, Jr., were servants of Bridgeview. (4) The remaining criteria of section 317 were met under the facts of this case. Specifically, the assistant coaches were on premises they were privileged to enter because they were servants of Bridgeview, Ted Loy knew or should have known of the necessity and opportunity for exercising control, and Ted Loy knew or should have known that he had the ability to control the coaches.

We address each step in plaintiffs' reasoning in turn.

### Was Ted Loy an Agent of Bridgeview?

Bridgeview expressly conceded both before and during trial that Ted Loy was their agent during the game. Bridgeview has not taken a different position on appeal.

### Was Ted Loy the "Master" for Purposes of Establishing the Notice and Ability to Control Requirements of Section 317?

While Bridgeview concedes that Ted Loy was its agent during the game, it argues that it is wrong to focus upon Ted Loy in determining whether Bridgeview, as an institution, knew of the necessity and had the ability to exercise control over George Loy, Sr., and George Loy, Jr. According to Bridgeview, the relevant inquiry in the case at bar is not what Ted Loy knew or did but, rather, what the members of the Bridgeview board knew and did. In other words, according to Bridgeview, the "master," for purposes of establishing the notice and ability to control requirements of section 317, is the Bridgeview board, not Ted Loy.

Bridgeview further emphasizes, and plaintiffs concede, that the members of the Bridgeview board had no

knowledge that any of the Loys had attempted to attack or intimidate opposing coaches on any occasion prior to July 30, 1990. Ted Loy in particular had managed for Bridgeview before July 30 without incident and, as far as the board knew, had a good reputation in the community. Moreover, none of the board members were present at · the July 30 game. Thus, according to Bridgeview, without a board member present at the game, and without any indication that a board member needed to attend, the board did not have the opportunity or knowledge necessary to exercise control over any of the Loys, as required under section 317. Therefore, no affirmative duty could be imposed.

The question of who must have notice of the need to control, and who must have the ability to control, arises in this case because of the nature of plaintiffs' claim against Bridgeview. Plaintiffs are not attempting to recover against Bridgeview for the physical harms caused by George Loy, Sr., and George Loy, Jr., under principles of *respondeat superior*. To succeed under *respondeat superior*, plaintiffs would have to establish that the assault on John Hills was committed by the Loys within the scope of their agency or employment. *Wright v. City of Danville*, 174 Ill. 2d 391, 405 (1996). Plaintiffs have admitted that this was not the case.

Rather than attempting to recover under *respondeat superior* for the physical harms caused by the Loys, plaintiffs have claimed that Bridgeview was "directly" negligent in failing to supervise and control the assistant coaches. To establish this claim of direct negligence, plaintiffs do not have to show that the attack on John Hills was committed within the scope of the Loys' agency or employment. *Lancaster v. Norfolk & Western Ry. Co.*, 773 F.2d 807, 818, 820 (7th Cir. 1985); Restatement (Second) of Torts § 317, Comment *a*, at 125 (1965). Plaintiffs must, however, establish that Bridgeview had

an affirmative duty to control the Loys and that this duty was breached. In particular, pursuant to section 317, plaintiffs must show that Bridgeview knew or had reason to know of the need to control the Loys, that it knew or had reason to know that it had the ability to control the Loys, and that it negligently failed to act on that information. "But there is an obvious difficulty with speaking of [a corporation] in this connection. A corporation is not a human being; 'its' knowledge is the knowledge of particular employees. The question is therefore what level of employee need be informed [of the need to control] to make the corporation liable ***. Oddly, we can find little in the tort cases or commentary on this question, maybe because 'direct negligence' is important only in those cases, which apparently are rare, where an employee commits a tort not in furtherance of his employer's business; in any other case respondeat superior provides a simpler route to establishing the employer's liability." *Lancaster*, 773 F.2d at 820.

We do not agree with Bridgeview's contention that a member of the Bridgeview board must have been aware of the need to control the Loys before an affirmative duty to control could arise. In the case at bar, Bridgeview board members Ronald Mizwicki and Gregory Klein both testified that, as manager of the Bridgeview team, Ted Loy had general supervisory authority over his players and coaches. Part of Ted Loy's responsibilities as manager included making sure that his players and coaches engaged in good sportsmanship and that they adhered to Bridgeview's rules and guidelines regarding behavior during games. Ted Loy was given these responsibilities, according to Mizwicki, precisely because Bridgeview board members could not themselves attend the games on a regular basis. Because the board specifically entrusted Ted Loy with the general supervisory authority over the team players and coaches, we hold that Ted

Loy was the "responsible agent" (*Lancaster*, 773 F.2d at 820) of Bridgeview, and that he may be considered the "master" for purposes of establishing the notice and ability to control requirements of section 317. See *Kigin v. Woodmen of the World Insurance Co.*, 185 Ill. App. 3d 400, 403 (1989) (an individual who had "overall supervisory and managerial authority" over a youth campground owned by a "fraternal organization" was considered to be that organization for purposes of establishing the notice and ability to control requirements of section 317); see also *Illinois Steel Co. v. McFadden*, 196 Ill. 344, 349 (1902) (a superintendent at a steel mill was a "vice-principal" of the steel company (thus barring application of the fellow servant rule) and his decision to do "work in a dangerous manner" was the decision of the company for the purpose of establishing the company's negligence); 27 Am. Jur. 2d *Employment Relationship* §§ 409 through 412 (1996). Therefore, if Ted Loy knew of the need to control and had the ability to control, and if the remaining criteria of section 317 are satisfied, then it may be said that Bridgeview had an affirmative duty to control the conduct of George Loy, Sr., and George Loy, Jr.

Bridgeview briefly asserts that once Ted Loy joined the attack on John Hills he abandoned his responsibility to supervise the assistant coaches and so completely departed from the scope of his agency that Bridgeview cannot be held liable for his inaction in failing to control the assistant coaches. Bridgeview does not cite any authority in support of this argument. Accordingly, we consider it waived. 155 Ill. 2d R. 341(e)(7); *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978) (when an appellant seeks reversal, " 'theories not pursued nor advanced with citation of authorities are deemed waived' [citations]").

Before addressing the remainder of plaintiffs' argument regarding the existence of an affirmative duty, we

offer a point of clarification. At times in their brief to this court, plaintiffs assert that Bridgeview, acting through the assistant coaches, George Loy, Sr., and George Loy, Jr., had an affirmative duty to control Ted Loy. This is incorrect. Under Illinois law, an affirmative duty to control the conduct of another will arise only if a special relationship exists between the actor and the party whose conduct is to be controlled. The only special relationship that has been alleged in the instant case is one of master-servant. On the record before us, there is no basis for holding that George Loy, Sr., or George Loy, Jr., had supervisory authority over Ted Loy. Thus, even if George Loy, Sr., and George Loy, Jr., are considered agents of Bridgeview, they cannot be considered "responsible agents" or "masters" for purposes of section 317. Therefore, Bridgeview had no affirmative duty, acting through George Loy, Sr., or George Loy, Jr., to control Ted Loy.[3]

### *Were George Loy, Sr., and George Loy, Jr., Servants of Bridgeview?*

Section 317 requires a master-servant relationship between the actor and the party whose conduct is to be controlled. The Restatement uses the term "servant" in a particular fashion, drawing a distinction between the general term "agent" and the more specific term "ser-

---

[3]There is no legal basis upon which Bridgeview can be held liable for the physical harms caused by Ted Loy. Bridgeview cannot be held liable for the physical harms caused by Ted Loy under *respondeat superior* because the attack on John Hills was admittedly outside the scope of Ted Loy's agency. Further, because no representatives of the Bridgeview organization, other than the Loys, were present at the game, and because no one from Bridgeview was aware of any violent propensities on the part of Ted Loy, there is no means by which Bridgeview could have known of the need to control Ted Loy. Notably, the jury in this case was not instructed that Bridgeview cannot be held liable for the physical harms caused by Ted Loy.

vant." See Restatement (Second) of Agency §§ 1, 2 (1958); see also Illinois Pattern Jury Instructions, Civil, No. 50.10 (3d ed. 1995) ("The term 'agent' is broader than either 'servant' or 'employee.' A servant or employee is an agent, but one may be an agent although he is neither servant nor employee"). The Restatement defines a servant as a type of agent "employed by a master to perform service in his affairs whose *physical conduct* in the performance of the service is controlled or is subject to the right to control by the master." (Emphasis added.) Restatement (Second) of Agency § 2(2), at 12 (1958). Although the right to control the physical conduct of the person giving services most often determines whether the relationship of master and servant exists, the right to control may be attenuated. Restatement (Second) of Agency § 220, Comment *d*, at 487 (1958). In addition, a number of other factors may play a role in establishing the master-servant relationship. Restatement (Second) of Agency § 220 (1958). Ultimately, "[t]he relation of master and servant is one not capable of exact definition" (Restatement (Second) of Agency § 220, Comment *c*, at 486 (1958)), and it is generally left to the trier of fact to determine whether the relationship exists (Restatement (Second) of Agency § 220, Comment *c*, at 486-87 (1958)). See also *Merlo v. Public Service Co.*, 381 Ill. 300, 319-20 (1942) ("The question as to whether or not the relationship of master and servant exists is dependent upon certain facts and circumstances. These facts include the question of the hiring, the right to discharge, the manner of direction of the servant, the right to terminate the relationship, and the character of the supervision of the work done. Unless these facts clearly appear, the relationship cannot become purely a question of law").

In the circuit court in the case at bar, plaintiffs did not argue that George Loy, Sr., and George Loy, Jr., were

servants of Bridgeview, as that term is used in the Restatement. Plaintiffs did assert, however, that the assistant coaches were agents of Bridgeview and that, as such, Bridgeview had a duty to control their actions. Bridgeview disputed this assertion and argued before the jury that the assistant coaches were not its agents. At the close of evidence, the jury was given Illinois Pattern Jury Instructions, Civil, No. 50.05, which states, in pertinent part, that "[i]f you find that one person has *the right to control the actions of another at a given time*, you may find that the relation of principal and agent exists, even though the right to control may not have been exercised." (Emphasis added.) Illinois Pattern Jury Instructions, Civil, No. 50.05 (3d ed. 1995) (hereinafter IPI Civil 3d). By returning a verdict in favor of plaintiffs, the jury implicitly determined that George Loy, Sr., and George Loy, Jr., met this definition of agency.

On appeal, Bridgeview does not argue that the evidence offered at trial was insufficient to support the jury's finding of agency. Nor does it argue that the jury's finding of agency, as defined in IPI Civil 3d No. 50.05, is insufficient to establish a master-servant relationship. Accordingly, any such argument is waived. 155 Ill. 2d R. 341(e)(7) ("Points not argued are waived"). Therefore, for purposes of this appeal, we will assume that George Loy, Sr., and George Loy, Jr., were servants of Bridgeview.

*Were the Remaining Criteria of Section 317 Met?*

Section 317 requires, as a condition of imposing an affirmative duty to control, that the servant subject to control be upon premises "in possession of the master" or upon "which the servant is privileged to enter only as [the master's] servant." There is no dispute that this condition was met in the case at bar. The baseball field on which the Bridgeview-Lemont game was played and on which the attack took place was not open to the gen-

eral public. George Loy, Sr., and George Loy, Jr., were allowed in the dugouts and on the field only because they were Bridgeview's assistant coaches.

Section 317 also requires, as a condition of imposing an affirmative duty to control, that the master know or have reason to know "of the necessity and opportunity" to control the servant. The parties dispute what type of notice Ted Loy must have had regarding the need to control the assistant coaches before the duty to control could arise. Citing to cases discussing a parent's affirmative duty to control a child, Bridgeview argues that specific instances of prior misconduct by George Loy, Sr., and George Loy, Jr., were required before any duty to control could be imposed. See, *e.g.*, *Bishop v. Morich*, 250 Ill. App. 3d 366, 370 (1993) (to establish that parents negligently failed to control a child to prevent an intentional tort, plaintiff must establish, *inter alia*, that parents "were aware of specific instances of prior conduct sufficient to put them on notice that the act complained of was likely to occur"); see also F. James, *Scope of Duty in Negligence Cases*, 47 Nw. U. L. Rev. 778, 812 (1953) (and cases cited therein) (discussing the master's affirmative duty to control his servants and noting that before the duty will be imposed "[i]t must be shown *** that the likelihood of [acts done entirely on the servant's own account] had been brought home to the master, *e.g.*, by a showing that the acts had occurred so persistently that the master knew or should have known of them"). Because there was no evidence of prior assaults or physical attacks by any of the Loys, Bridgeview argues that it had no notice of the need to control and that no affirmative duty to control could be imposed.

Plaintiffs, in contrast, argue that prior incidents of misconduct are not required before the duty to control may be imposed. According to plaintiffs, the proper focus in determining whether the master has sufficient notice

of the need to control is on the time immediately preceding the attack, not "days, weeks, or months" before. Plaintiffs further argue that George Sr.'s swearing and gesturing was sufficient to put Ted Loy on notice that an attack was forthcoming and, therefore, that there was a need to control the assistant coaches.

Under either standard of notice proposed by the parties in this case, it is clear that, prior to the commencement of the attack on John Hills, Ted Loy did not have notice that George Loy, Sr., or George Loy, Jr., would intentionally harm John Hills. There was no evidence offered at trial that George Loy, Sr., or George Loy, Jr., had any violent propensities, that they had ever committed a previous assault on any person, or that Ted Loy knew of any violent tendencies on their part. Moreover, the witnesses at trial who viewed the attack uniformly testified that they were "surprised," "shocked" and "stunned" when the attack on John Hills began. No witness stated that he or she foresaw the attack approaching. Most importantly, both John Hills and Patricia Hills testified unequivocally that, despite the swearing and gestures, they did not believe that George Loy, Sr., was going to physically assault John Hills. Under ordinary negligence standards, " ' "[f]oreseeability means that which is objectively reasonable to expect, not merely what might conceivably occur." ' " (Emphasis omitted.) *American National Bank & Trust Co. v. National Advertising Co.*, 149 Ill. 2d 14, 29 (1992), quoting *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 466 (1976), quoting *Winnett v. Winnett*, 57 Ill. 2d 7, 12-13 (1974). In addition, "[s]erious crimes are generally unforeseeable because they are different in nature from what employees in a lawful occupation are expected to do." *Wright v. City of Danville*, 174 Ill. 2d 391, 405 (1996). Given the record before us, there is no basis for holding that Ted Loy knew or should have known, before the attack began, that the assistant coaches were going to intentionally harm John Hills.

Citing to *Shortall v. Hawkeye's Bar & Grill*, 283 Ill. App. 3d 439 (1996), plaintiffs argue in the alternative that, even if Ted Loy did not know of the need to control George Loy, Sr., and George Loy, Jr., before the attack began, he must have known of the need to control them after the assault had started. See *Shortall*, 283 Ill. App. 3d at 443 ("A criminal attack by a third person is reasonably foreseeable *** when a serious physical altercation has already begun"). The appellate court below agreed with this reasoning, concluding that Ted Loy knew of the need to control "once the beatings began and two one-minute lulls followed" and that an affirmative duty to control the assistant coaches arose after the attack began.[4] We disagree.

Section 317 requires more than that the master be aware of the need to control before the duty to control will arise. The master must also know or have reason to know that he has "the ability to control his servant." The "ability to control" requirement of section 317 does not mean that Ted Loy had to be able to physically restrain the assistant coaches before a duty to control could be imposed. "There is no duty to control another's conduct at the risk of the actor" (F. Harper & P. Kime, *The Duty to Control the Conduct of Another*, 43 Yale L.J. 886, 888 (1934)) and plaintiffs do not argue that Ted Loy was required to physically intervene in the assault. Nevertheless, the term "control" is used in section 317 "in a very real sense." 43 Yale L.J. at 891. Under section 317,

---

[4]Under their reasoning, the appellate court erred in not remanding the cause to the circuit court. According to the appellate court, Bridgeview, acting through Ted Loy, had a duty to control George Loy, Sr., and George Loy, Jr., which arose only sometime after the attack on John Hills began. Thus, Bridgeview could not be liable for the injuries to John Hills that occurred during the initial portion of the attack. The jury was never instructed that Bridgeview's liability was limited in this way. Remand to the circuit court would therefore have been appropriate.

"the essential basis of liability [is] *the practical opportunity for effective control arising from the general master-servant relationship* and from the connection between the dangerous conduct and the employment." (Emphasis added.) F. James, *Scope of Duty in Negligence Cases*, 47 Nw. U. L. Rev. 778, 812 n.183 (1953).

Section 317 is addressed primarily to the most common form of master-servant relationship, that of employer and employee. See Restatement (Second) of Torts § 317, Comments *b, c,* at 125-26 (1965) (giving examples of a factory owner and a railroad company's duty to control their employees). In a situation such as that presented here, where it is alleged that a master has a duty to intervene in an ongoing criminal attack committed by its servants, there is a theoretical justification for imposing a duty to control upon the master, when the master is an employer and the servant is a paid employee. Because an employer controls an employee's salary, an employer has economic leverage and, hence, a measure of actual control over an employee. During an ongoing assault, an employer may use that economic leverage, and exercise his authority as master, by verbally threatening to discipline, demote or discharge an employee if he or she does not stop the assault. Arguably, even in the heat of an attack, an employee may pause when threatened with the loss of his livelihood or a portion thereof. Imposing a duty to control on the employer in such a situation is thus, generally speaking, warranted. See, *e.g.*, *Sunseri v. Puccia*, 97 Ill. App. 3d 488, 494 (1981) (owner of a restaurant and lounge potentially liable for failing to act in any manner to terminate altercation in which employee bartender participated).

In the case at bar, however, George Loy, Sr., and George Loy, Jr., were not paid employees of Bridgeview. They were volunteers. Unlike an employer, a master of a volunteer has no inherent economic leverage or control

over that volunteer. Further, volunteers typically provide their services for reasons other than their own personal benefit. In the instant case, for example, George Loy, Sr., and George Loy, Jr., may have agreed to act as assistant coaches solely as a favor to Ted Loy. If such were the case, a verbal threat by Ted Loy to "discipline" or "fire" the assistant coaches would have been worthless as an effective means of control.

Plaintiffs point out that, under the Restatement, "one who volunteers services without an agreement for an expectation of reward may be a servant of the one accepting such services." Restatement (Second) of Agency § 225 (1958). Plaintiffs contend that the volunteer status of the assistant coaches should not affect the resolution of this case. However, plaintiffs have not explained, under the facts of this case, what effective means of control Ted Loy could have utilized, in his capacity as master, to constrain the volunteer assistant coaches once the attack began. In the absence of any evidence of an effective means of control available to Ted Loy and, therefore, to Bridgeview, it would be "tantamount to imposing strict liability" (*Estates of Morgan v. Family Counseling Center*, 77 Ohio 284, 298, 673 N.E.2d 1311, 1323 (1997)) to require Bridgeview to control the conduct of the volunteer assistant coaches. We decline to impose that standard of liability upon Bridgeview.

The appellate court below erred when it concluded, without analysis or qualification, that the volunteer assistant coaches were subject to sufficient control after the assault began to establish Bridgeview's liability pursuant to section 317. There is no authority to support such a holding and it is at odds with the requirement of actual control set forth in section 317.

On this record, we hold that the volunteer relationship between Bridgeview and George Loy, Sr., and George Loy, Jr., lacked sufficient elements of control to bring

that relationship within the purview of section 317. Accordingly, we conclude that Bridgeview had no affirmative duty to control the assistant coaches to curtail the criminal attack. Because Bridgeview, acting through Ted Loy, had no affirmative duty to control George Loy, Sr., or George Loy, Jr., the trial judge erred in denying Bridgeview's motion for judgment notwithstanding the verdict.

### Justice Willow Springs Little League

Like Bridgeview, Justice initially contends that the circuit court erred in denying its motion for judgment notwithstanding the verdict because it did not have an affirmative duty to protect John Hills from the attack committed by the Loys. Whether a duty exists is a question of law. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987).

Plaintiffs' argument regarding the affirmative duty owed by Justice is narrow. Plaintiff's argument is limited to the contention that Justice had a duty to protect John Hills from "the attacks made upon him." In other words, plaintiffs maintain that Justice had an affirmative duty to exercise reasonable care to protect John Hills from reasonably foreseeable attacks by other coaches who were on the playing field during the game. Given the scope of plaintiffs' argument, we express no opinion on whether Justice had an affirmative duty in other contexts, such as an affirmative duty to protect coaches from spectators or other individuals not on the playing field or an affirmative duty to protect the children on the playing field from foreseeable attacks.

Generally, a possessor of land owes no duty to protect lawful entrants from criminal attacks by third parties. *Rowe v. State Bank*, 125 Ill. 2d 203, 215-16 (1988); Restatement (Second) of Torts § 314 (1965); see also *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 52 (1991) (" '[the] imposition of a general duty to anticipate and guard

against the negligence of others would place an intolerable burden on society' ''), quoting *Dunn v. Baltimore & Ohio R.R. Co.*, 127 Ill. 2d 350, 366 (1989). This general rule, like the general rule that one has no duty to control the conduct of another, has been much debated. Compare R. Epstein, *A Theory of Strict Liability*, 2 J. Legal Stud. 151 (1973), with J. Adler, *Relying Upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others*, 1991 Wis. L. Rev. 867; see also D. Dobbs, Law of Torts, ch. 21, at 854 nn.4-8 (2000) (listing representative literature). Neither Justice nor plaintiffs have asked us to abandon or modify the general, no-affirmative-duty rule.

The common law recognizes an exception to the rule that a landholder owes no duty to protect entrants from criminal attacks where the landholder and the entrant stand in a special relationship with each other that warrants imposing such a duty. *Rowe*, 125 Ill. 2d at 215-16; Restatement (Second) of Torts § 314A (1965). The existence of a special relationship does not, by itself, impose a duty upon the possessor of land to protect lawful entrants from the criminal acts of third parties. Before a duty to protect will be imposed it must also be shown that the criminal attack was reasonably foreseeable. See, *e.g.*, *Rowe*, 125 Ill. 2d at 215-16. In addition, whether a duty exists will depend upon a ''consideration of the likelihood of injury, the magnitude of the burden to guard against it, and the consequences of placing that burden upon the defendant.'' *Rowe*, 125 Ill. 2d at 227-28.

Illinois courts and the Restatement (Second) of Torts recognize four categories of special relationships that may give rise to a duty to protect an individual from criminal attack. See Restatement (Second) of Torts § 314A (1965). Three of these special relationships, *i.e.*, common carrier and passenger, innkeeper and guest, and

custodian and ward, have no bearing on this case. A fourth special relationship recognized by the Restatement is set forth in detail in section 344 and is relevant to the resolution of the case at bar. Section 344 provides:

> "Business Premises Open to Public: Acts of Third Persons or Animals
>
> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

Restatement (Second) of Torts § 344 (1965).

The rationale for recognizing the special relationship set forth in section 344 differs from the rationale governing the other well-established special relationships, *i.e.*, common carrier-passenger, innkeeper-guest and custodian-ward, that may give rise to a common law duty to protect individuals from third-party attacks. With respect to these latter relationships, it has been said that "since the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated." *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477, 483 (D.C. Cir. 1970). In contrast, the common law generally "refuse[d] to recognize such a special relationship between the commercial landowner and his patron since the patron had not placed himself under sufficient control of the landowner to warrant imposition of li-

ability." M. Bazyler, *The Duty to Provide Adequate Protection: Landowner's Liability for Failure to Protect Patrons from Criminal Attack*, 21 Ariz. L. Rev. 727, 736 (1979).

Nevertheless, in recent years, a large number of courts have recognized a special relationship between a business that is open to the public and its customers which may give rise to a duty on the part of the business to protect its patrons from third-party attacks. Part of the reason for recognizing this special relationship is that, generally speaking, commercial establishments are well positioned "to know the extent of crime on the premises \*\*\* to take measures to thwart it and to distribute the costs" associated with providing security. *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 903 (Tenn. 1996); 21 Ariz. L. Rev. at 747-48. A more important reason for recognizing the special relationship, however, focuses on the action taken by a landholder who opens his premises to the public for business purposes and upon the nature or character of a business open to the general public.

As the Restatement notes, there are situations in which a landholder, "as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. [This situation may arise] where the [landholder's] own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." Restatement (Second) of Torts § 302B, Comment *e*, at 90 (1965). When a landholder opens his premises to the public for business purposes, he must recognize the risk that has been created:

"[P]laces to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave,

and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation." *Feld v. Merriam*, 506 Pa. 383, 391, 485 A.2d 742, 745 (1984).

See also *McClung*, 937 S.W.2d at 897 (and authorities cited therein) (noting that modern courts have been willing to hold that businesses have a duty to protect patrons from foreseeable third-party attacks, in part, "as a result of the prevalence of violent crimes at commercial establishments").

Thus, generally stated, it is the nature of the business which the landholder conducts on his premises that determines whether the business stands in a special relationship with its customers that may impose a duty to provide security or protection from third-party attacks. See Restatement (Second) of Torts § 344, Comment *f*, at 226 (1965) ("If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection"); see also *Ann M. v. Pacific Plaza Shopping Center*, 6 Cal. 4th 666, 680 n.8, 863 P.2d 207, 216 n.8 (1993) (noting that the character of some business establishments open to the public, such as a parking garage or an all-night convenience store, creates " ' "an especial temptation and opportunity for criminal misconduct" ' [citations]" that helps give rise to, and affects the scope of, the duty to protect).

In the case at bar, plaintiffs' argument regarding Justices' liability is based exclusively upon the existence of a special relationship between Justice and John Hills and upon the existence of an affirmative duty on the part of Justice to protect John Hills from the Loys' criminal attack. Plaintiffs do not contend that Justice stood in a

special relationship with John Hills because the Justice playing field was open to the public for business purposes, or because Justice, by hosting a Little League baseball game, created dangerous conditions that attracted crime. Instead, citing to *Hill v. Charlie Club, Inc.*, 279 Ill. App. 3d 754 (1996), plaintiffs maintain that Justice and John Hills stood in a special relationship because they were, respectively, a "business invitor and invitee."

Plaintiffs observe that a "person is a business invitee on the land of another if (1) the person enters by express or implied invitation; (2) the entry is connected with the owner's business or with an activity conducted by the owner on the land; and (3) the owner receives a benefit." *Charlie Club, Inc.*, 279 Ill. App. 3d at 759. Plaintiffs point out that the Lemont team, including John Hills, received a written invitation to participate in the baseball tournament and that the tournament was conducted as an organized activity on Justice's land. Plaintiffs further observe that the Lemont team paid a $125 entrance fee to participate in the tournament and that if the fee had not been paid John Hills would not have been allowed upon the playing field. Plaintiffs acknowledge that the entrance fee was used to pay for trophies, food for the teams, and other incidentals. Plaintiffs stress, however, that Justice admitted that some "nominal" profit was left from the entrance fees following these expenditures. Plaintiffs argue, therefore, that Justice received a benefit from John Hills' presence on the field and that he was a business invitee. Thus, according to plaintiffs, Justice and John Hills stood in a special relationship with one another and the general rule that a landholder has no duty to protect lawful entrants from third-party attacks does not apply.

Although neither plaintiffs nor Justice mentions this fact, we note that there is a split in our appellate court regarding the definition of the special relationship that

may impose upon landholders the duty to protect lawful entrants from third-party attacks. One line of appellate decisions describes the special relationship as it is expressed in section 344 of the Restatement (Second) of Torts, holding that the special relationship arises when the possessor of land holds the premises open to the public for entry for business purposes. See, *e.g.*, *Loomis v. Granny's Rocker Nite Club*, 250 Ill. App. 3d 753, 758 (1993); *Hayes v. O'Donnell*, 76 Ill. App. 3d 695, 697 (1979) (a business open to the public, such as a tavern, has an affirmative duty to take reasonable steps to protect its patrons against the misconduct of third parties). A second line of decisions, however, states the rule as plaintiffs in the case at bar do, singling out as the dispositive question whether the possessor of land receives a benefit from the lawful entrant. See, *e.g.*, *Charlie Club, Inc.*, 279 Ill. App. 3d at 759. To determine which line of appellate decisions describes the special relationship correctly, we look to this court's decision in *Rowe v. State Bank*, 125 Ill. 2d 203, 215-16 (1988).

In *Rowe*, this court for the first time stated that a possessor of land may have a duty to protect lawful entrants from criminal attacks "where the parties are in a position of *** business invitor and invitee." *Rowe*, 125 Ill. 2d at 216. In support of this statement, the court cited to *Jacobsma v. Goldberg's Fashion Forum*, 14 Ill. App. 3d 710 (1973), *O'Brien v. Colonial Village, Inc.*, 119 Ill. App. 2d 105 (1970), and W. Keeton, Prosser & Keeton on Torts § 33, at 201-02 (5th ed. 1984). *Jacobsma*, which concerned whether a duty of care was owed to a customer in a clothing store who was injured while attempting to stop a shoplifter, relied upon *O'Brien* in its duty analysis. *Jacobsma*, 14 Ill. App. 3d at 714. At issue in *O'Brien* was whether a complaint against a shopping center stated a cause of action for injuries resulting from a criminal assault against a patron that took place in the center's

parking lot. In holding that the shopping center could not be charged with a duty to protect based upon the facts alleged in the complaint, the *O'Brien* court described the rule recognized in section 344 of the Restatement (Second) of Torts: "[t]here is a duty of an owner or occupier of land, which the public is invited to patronize, to maintain the premises in a reasonably safe condition for anticipated use; and there may be circumstances which extend this responsibility to protect a patron against a criminal attack by a third person." *O'Brien*, 119 Ill. App. 2d at 106-07, citing Annotation, *Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person*, 10 A.L.R.3d 619, 630 (1966). See also W. Prosser, Prosser & W. Keeton on Torts § 33, at 202 n.89 (5th ed. 1984) (citing cases involving business establishments open to the public).

When this court in *Rowe* used the term "business invitee" to describe the special relationship that may give rise to the duty to protect entrants from criminal attack, the court was unquestionably referring to the special relationship as described by *O'Brien* and, more generally, by section 344 of the Restatement (Second) of Torts. Indeed, if the court in *Rowe* had understood the term "business invitee" to mean simply those invited onto the premises by the landholder for some benefit to the landholder, then the outcome of *Rowe* would have been different. *Rowe* holds that a landlord does not stand in a special relationship with a tenant for purposes of establishing a general duty to protect the tenant from foreseeable criminal activity on the landlord's premises. *Rowe*, 125 Ill. 2d at 216, citing *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 208 (1979) (landlord owes no general duty to protect tenants from foreseeable criminal activity); *Phillips v. Chicago Housing Authority*, 89 Ill. 2d 122, 126 (1982) (same). Because a landlord receives a benefit from his or her tenants, those tenants are "busi-

ness invitees" as plaintiffs use that term. Thus, *Rowe* necessarily would have been decided differently had the court employed the term "business invitee" as plaintiffs in the case at bar do.

*Rowe* establishes that the proper description of the special relationship that may give rise to a landholders' duty to protect an entrant from criminal assault is stated in section 344 of the Restatement (Second) of Torts. We are not persuaded to abandon this position in favor of a special relationship which is focused primarily on the benefit received by the landholder from the entrant. Such a relationship does not, as plaintiffs suggest, provide a satisfactory basis for departing from the general rule that there is no duty to protect an entrant from criminal attack. For example, under plaintiffs' reasoning, Justice would have had no special relationship with John Hills and, hence, no duty to protect John Hills from the Loys' assault, if the game and the assault had taken place during the little league's regular season and a tournament entrance fee had not been charged. This would be so despite the fact that the risk of criminal conduct created by Justice would be completely identical to the risk created when Justice hosted the July 30 tournament game. It makes little sense to base a special relationship that may impose a duty to protect solely on the presence or absence of an item, a tournament entrance fee, that has no relation to the question of whether Justice created conditions that gave rise to "a recognizable high degree of risk of harm" (Restatement (Second) of Torts § 302(b) (1965)) by criminal attack.

Section 344 states what is widely regarded as the appropriate test for establishing the special relationship between a possessor of land and an entrant that may give rise to an affirmative duty to protect the entrant from third-party attacks. See, *e.g.*, D. Dobbs, Law of Torts, ch. 21, at 876 (2000) ("The rule today [regarding the affir-

mative duty to protect entrants from third-party attacks]
is usually generalized to include all landowners who open
their land to the public for business"); *McClung*, 937
S.W.2d at 898 (listing cases); but see *Scott v. Harper Rec-
reation, Inc.*, 444 Mich. 441, 448, 506 N.W.2d 857, 861
(1993) ("a merchant is not ordinarily required to protect
customers from the criminal acts of third persons"). We
adhere to the special relationship described in section
344 today.

Under the rule established in *Rowe* and section 344
of the Restatement (Second) of Torts, we find no special
relationship giving rise to an affirmative duty to protect
in the case before us. The playing field on which the at-
tack on John Hills took place was not a business open to
the general public. The only people permitted on the
field at the time of the game were the two teams and the
umpires. Indeed, as was noted previously in our discus-
sion regarding defendant Bridgeview, plaintiffs have af-
firmatively argued that the Loys were privileged to enter
the playing field only because of their status as Bridge-
view's manager and coaches.

The dissenting justice concludes that the general rule
that a landowner has no affirmative duty to protect
entrants from criminal attack should be set aside with
respect to Justice. According to the dissent, violence in
youth sports has become so commonplace that, as a mat-
ter of public policy and for social considerations, this
court should recognize that Justice had an affirmative
duty to protect John Hills from the Loys' criminal at-
tack. Plaintiffs have at no time, either in the circuit court
or on appeal, made the argument advanced by the dis-
sent. Indeed, during the proceedings before the circuit
court, plaintiffs repeatedly stated that they were *not*
arguing for the recognition of any new special relation-
ship or new basis for avoiding the no-affirmative-duty
rule but, instead, were relying upon the well-established

"business invitor-invitee" relationship recognized in Illinois case law. Because of this strategic choice, plaintiffs made no attempt to establish that criminal assaults by coaches and managers are common events at Little League baseball games. There is no evidence in the record, either in the form of written studies or oral testimony, regarding the number or type of violent attacks committed by coaches at Little League baseball games or other youth sporting events in Illinois or elsewhere. The only general statement regarding incidents of violence in this record comes from plaintiff Patricia Hills, who stated that, with the exception of the Loys' assault, she had never seen one Little League coach physically attack another. Since there is no evidence of record to support the conclusion that youth coaches and managers in Illinois are, as a group, prone to commit criminal attacks and since plaintiffs do not argue that there is such evidence, we decline to impose an affirmative duty to protect upon the hosts of youth athletic events on that basis.

The appellate court erred when it concluded that a special relationship existed between Justice and John Hills. Because the Justice playing field was not open to the general public for business purposes, Justice did not stand in a special relationship with John Hills. As noted, plaintiffs have not alleged that any other special relationship existed between Justice and John Hills or that there is any other basis for imposing a duty to protect upon Justice. Accordingly, we conclude that Justice did not have an affirmative duty to protect John Hills from the criminal attack of another coach. Therefore, the circuit court erred in denying Justice's motion for judgment notwithstanding the verdict.

### Section 2—1117

In light of our disposition of this appeal, we need not address defendants' contention that the circuit court erred in excluding the Loys from the apportionment of

fault under section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1994)).

## CONCLUSION

For the foregoing reasons, the judgments of the appellate and circuit courts are reversed.

*Judgments reversed.*

CHIEF JUSTICE HARRISON, dissenting:

I would affirm the appellate court's judgment and allow the jury's verdict to stand.

In reversing as to Bridgeview, the majority focuses on the element of forseeability. In my colleagues' view, Bridgeview did not know and should not have been expected to realize, before the attack began, that the team's assistant coaches would intentionally harm John Hills. My colleagues, however, are not the appropriate arbiters of that question. Forseeability is normally a question for the jury. *Winnett v. Winnett*, 57 Ill. 2d 7, 13 (1974). In this case, a special interrogatory was presented to the jury which asked:

"Did the Bridgeview Little League Association, through any of its agents, know or should have it in the exercise of ordinary care have [*sic*] known that the initial attack and/or further attacks would occur?"

The jury answered this question in the affirmative. There is no basis for second-guessing its judgment. Ted Loy was unquestionably Bridgeview's agent, and George Loy's extraordinarily abusive language and conduct should have alerted him that violence loomed. But he did nothing. Even after the assault began, he did nothing.

It is not true, as the majority suggests, that Ted was powerless to act. While he may not have had any economic leverage over his assistants, he could have threatened to strip them of their authority as his volunteer assistants, he could have admonished them to desist, he could have asked game officials to intervene. But

again, he did none of those things. Instead, he "sneaked away" and then later joined in the attack on Hills himself. Under these circumstances, it was entirely proper for the jury to hold Bridgeview liable for what happened to Hills.

There is likewise no merit to the majority's decision to strip plaintiffs of their verdict against Justice, the host and sponsor of the tournament and owner of the premises where the tournament took place. We have specifically held that a landowner may have a duty to protect others from criminal activity by third persons on its property where a special relationship exists between the parties, such as the relationship between a business invitor and invitee. *Rowe v. State Bank*, 125 Ill. 2d 203, 215-16 (1988). Such a relationship existed here.

My colleagues' attempt to recast the meaning of *Rowe* is unpersuasive. The case does hold that the simple relationship between a landlord and a tenant is not a special one imposing a duty to protect against the criminal acts of others. *Rowe*, 125 Ill. 2d at 216. That holding, however, merely clarifies that the particular relationship between a landlord and tenant presents a special case which is treated differently under Illinois law. Contrary to the majority's view, nothing in *Rowe* suggests that a person who conducts business on land he possesses is liable only to members of the general public and not those, such as John Hills and his players, who have paid a fee for the right to be there.

By differentiating between members of the general public and tournament entrants such as Hills and his team, the majority's analysis produces an anomalous result. Under the majority's view, Bridgeview might owe a duty to spectators who came to watch the tournament and buy refreshments and souvenirs, but it would never have an obligation to those who were actually on the field participating in the games, no matter how egregious the circumstances.

By any reasonable standard, game participants should be afforded more protection than the general public, not less. The players and their coaches are the center of events such as this. They are what everyone else comes to see. It is their actions that stir the crowds. It is what they do that generates enthusiasm or derision. As such, they are far more likely than members of the general public to be subject to serious abuse and attack.

*Amicus* Little League, Inc., asserts that "[f]or the most part, Little League baseball does not attract the least savory elements of the communities in which it thrives" and that "the likelihood of injury stemming from participant violence is minuscule in this setting." The matter before us belies such claims. Indeed, to deny the substantial risks now faced by players and their coaches is to deny everyday experience. Anyone who has ventured beyond the confines of the courthouse knows what sport, even amateur sport, has become. On the best days, it is inspirational. On its worst days, and the day Hills was beaten was surely one of those, it is a reflection of how uncivil and violent our society can be. In the heat of competition, otherwise sensible adults can lose all sense of proportion. Tempers flare. Mayhem can spread in an instant.

The unhappy truth is that violence in youth sports has become commonplace. The era of friendly pickup games and sandlot ball where kids made the rules and adults seldom meddled has passed. Accounts of fistfights, beatings and even homicides involving parents, coaches and officials at children's sporting events are appearing in the media with ever-increasing frequency. Special Report: Out of Control, Sports Illustrated Magazine (July 24, 2000). In these times, we do a disservice when we say that defendants such as Justice owe no duty to plaintiffs such as John Hills.

A court's determination of duty should reflect the

policy and social requirements of the time and community. *Curtola v. Village of Niles*, 154 Ill. 2d 201, 215 (1993). I believe that public policy and social considerations of these times and of our community require that property owners who sponsor youth athletic tournaments on their premises do more than just look away when the physical well-being of tournament participants is threatened. When a player or coach is attacked, as Hills was here, they should at least be required to pick up the phone and summon law enforcement officials. Justice's agents, the umpires and field announcer, could have managed that easily and without risk or expense to themselves.

Requiring such an inconsequential burden to be placed on landowners who sponsor youth athletic tournaments will not imperil playing opportunities for children or inhibit the ability of youth organizations such as the Little League to function. To the contrary, by providing an incentive for landowner/sponsors to take responsibility for what occurs at their events, it should improve the quality and popularity of youth sporting events by facilitating a safer and more secure playing environment.

I cannot see how *amicus* Little League, Inc., the national supervisory organization for Little League baseball, can possibly take issue with such a result. When the Bridgeview Little League coaches beat John Hills into unconsciousness and the Justice Willow Springs Little League's agents took no action to stop them, they violated every principle of fair play, good sportsmanship and responsible citizenship. Their conduct has no place in athletics, especially youth athletics. Little League, Inc., should have done everything in its power to disavow what happened here. Instead, it sought and was granted leave to appear before our court and argue that its local affiliates be spared from the jury's verdict.

By adopting Little League, Inc.'s position and over-

turning the jury's verdict against Bridgeview and Justice Willow Springs Little League, my colleagues have chosen to look the other way just as Ted Loy and Justice looked the other way while Hills was being beaten. No good can come of this, as the jury here well understood. By exonerating Bridgeview and Justice, the court has placed its imprimatur on what happened to Hills. The thousands of individuals who so generously donate their time to organized youth athletics in Illinois would do well to consider the position in which this has left them. For all practical purposes, it is now open season on volunteer coaches. They should forget about watching the base runners or the catcher's signals. From now on, they had better just watch their backs.