NOTICE

Decision filed 08/27/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190257-U

NO. 5-19-0257

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JAMES McDANIEL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 11-L-569 |
| | ) | |
| CHAD A. CRANK, KEVIN W. McCORMICK, | ) | |
| and LILLIAN McCORMICK, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Kevin W. McCormick, Defendant-Appellee | ) | Heinz M. Rudolf, |
| and Cross-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Welch and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court erred in denying the defendant's posttrial motion for judgment notwithstanding the verdict after a jury entered a verdict against the defendant for negligence. The defendant did not have a duty to protect the plaintiff from the harmful conduct of a third party or to control the criminal conduct a third party.

¶ 2   The plaintiff, James McDaniel (McDaniel), filed a four-count complaint against the defendants, Chad A. Crank (Crank), Kevin W. McCormick (McCormick), and Lillian McCormick, for injuries McDaniel sustained when Crank hit McDaniel with a fire poker

1

during a party. The party was held on property owned by Lillian McCormick but was hosted by Kevin McCormick. Crank did not respond to the complaint, and a default judgment was entered against him for battery and negligence. After a trial, the jury entered a verdict in favor of McDaniel and against McCormick for negligence. The jury found that Lillian McCormick was not liable for negligence.

¶ 3    McDaniel appeals from the trial court's order denying his posttrial motion for a new trial on the issue of damages. McCormick cross-appeals from the trial court's order denying his posttrial motion for judgment notwithstanding the verdict. We reverse on McCormick's cross-appeal and vacate the trial court's judgment in favor of McDaniel.

¶ 4                                    BACKGROUND

¶ 5    McCormick resided on property owned by his mother, Lillian McCormick. McCormick constructed horseshoe pits on the property and, over the years, had hosted over a hundred horseshoe-throwing parties on the property. McCormick's friends had an open invitation to enter upon Lillian McCormick's land to attend the horseshoe-throwing parties. The same group of people usually attended these events, which occurred about every Saturday. McCormick often provided some food for his friends but did not charge his guests any fees. The attendees brought their own alcoholic drinks, and McCormick was aware that alcohol was being consumed during the parties.

¶ 6    McCormick testified that guests sometimes got into "heated discussions" during the parties, but that there had never been any serious physical altercations. The only evidence of any physical altercations, prior to the incident in this case, occurred approximately 10 to 13 years earlier when Kevin Smith (Smith) and "Doyle," who were friends, would

2

occasionally "push and shove" each other. McCormick was close friends with McDaniel, as they had known each other for approximately 30 years. McCormick knew Smith for 35 to 40 years. McDaniel and Smith frequently attended McCormick's parties.

¶ 7    In early October 2010, McCormick hosted a horseshoe-throwing party at his house. Michelle Meyers (Meyers) attended this party with her boyfriend, Crank. McCormick testified that he did not know Crank, and that this occasion was the first time he and Crank had met. McCormick told Meyers that she was welcome to come by and practice throwing horseshoes whenever there was a horseshoe-throwing party going on. McCormick testified that he did not know Meyers very well but was aware that she "start[ed] arguments with people." McCormick testified that during this party, "words [were] exchanged" between Crank and Smith. McCormick stated the exchange between Smith and Crank did not "really [go] that far," and McCormick had no reason to believe that the two men did not like each other after the exchange.

¶ 8    The following week, on October 9, 2010, McCormick hosted another party. McDaniel arrived at McCormick's home around 2 p.m., where McDaniel planned to eat, drink, and socialize with friends while throwing horseshoes. When McDaniel arrived at the house, several other people were already there, including Smith. Guests came and went throughout the day. At approximately 7 p.m., Meyers and Crank arrived at McCormick's house and joined the party. McCormick testified that while he had invited Meyers to the party, he had not invited Crank and did not know Crank was going to be attending until he arrived with Meyers.

¶ 9    At some point that evening, Meyers was using someone else's horseshoes during a game. Believing that the horseshoes belonged to McCormick, she asked McCormick if he would be willing to trade horseshoes with her. McCormick, who owned approximately 12 to 14 pairs of horseshoes, agreed to make the trade. Both McCormick and Meyers, however, were mistaken, as the horseshoes actually belonged to Smith.

¶ 10    Around 11:30 or 11:45 p.m., McCormick went inside the house to go to bed. McCormick testified he was tired because he had started barbequing food for the party early that day and he had had "a few too many beers." McCormick testified Smith and McDaniel were still at the party when he went to bed and that he trusted them with his home.

¶ 11    The party started to wind down around midnight, shortly after McCormick went to bed. McDaniel stated that Meyers was washing off the horseshoes she had traded for with McCormick when Smith told Meyers that she could not have the horseshoes because they belonged to Smith's nephew. Meyers insisted that McCormick had given her the horseshoes, while Smith insisted that the horseshoes were not McCormick's to give. Smith and Meyers started arguing. McDaniel told them to "knock it off, and leave it," and that they would settle everything the next day.

¶ 12    As Meyers was getting ready to leave, Crank approached Smith and the two men started talking. Meyers was upset that Crank was talking to Smith, so she ran over to the men and yelled at them. McDaniel pulled Smith aside, but Meyers reached over McDaniel and punched Smith. Smith then pushed Meyers, and the two fell over onto the ground. McDaniel pulled Meyers up from the ground and told her to leave. McDaniel testified that

4

Meyers was walking away from them when he heard a thumping sound. McDaniel looked over to see Crank hit Smith in the head with a fire poker. As Crank went to strike Smith again, McDaniel put his arm up and blocked the blow. The fire poker came down on McDaniel's arm, shattering a bone in his arm. Crank threw down the poker, and he and Meyers fled the scene in their car.

¶ 13 McDaniel testified that, out of all the guests at the party, he was the person who was the most familiar with Crank. McDaniel stated that he had been acquainted with Crank for many years and did not know Crank to be a violent person, or to have ever exhibited any violent propensities. That evening, Crank had been pitching horseshoes and had not caused any problems. McDaniel testified that nothing happened prior to the incident that would have led anyone to anticipate that Crank would cause a problem. McDaniel stated that the incident occurred quickly, and he did not anticipate getting hit with the fire poker.

¶ 14 At trial, McDaniel testified to the extensive injuries he sustained during the attack. McDaniel's counsel introduced into evidence copies of McDaniel's medical records from his treatment after the attack. McDaniel testified that these services, including two surgeries, were reasonable and necessary for his treatment, and were incurred as a result of the attack. Although McDaniel testified that the bills for the medical treatment he received had been paid, his counsel did not seek to admit any of the bills into evidence. Instead, counsel introduced into evidence a document he prepared, titled "Summary of Monetary Damages," which purported to summarize McDaniel's medical expenses and lost wages. This document, Exhibit 8 during the trial, was not objected to by defense counsel. Exhibit 8 indicated that $37,432.06 had been paid to five named medical providers, and that

McDaniel had incurred $7428.96 in lost wages, for a total of $44,861.02 in monetary damages.

¶ 15 On October 7, 2011, McDaniel filed an action against the defendants seeking damages for the injuries he sustained as a result of Crank's attack. In counts I and II, McDaniel brought claims for battery and negligence against Crank for directly causing his injuries.[1] In count III, McDaniel alleged McCormick knew Crank was prone to violence, that McDaniel was not aware of Crank's violent propensities, and that McCormick breached his duties to maintain the premises in a safe manner and to warn his other guests about Crank's violent tendencies. In count IV, McDaniel alleged Lillian McCormick breached her duty, as the owner of the premises, to maintain the premises in a safe manner and to warn others of the potential for violence during the parties.[2] On December 22, 2011, McCormick filed his answer and asserted the affirmative defense of contributory negligence.

¶ 16 On December 11, 2015, McCormick filed a motion for summary judgment asserting he had no duty to protect McDaniel from the criminal attack perpetrated by Crank because no special relationship existed between McCormick and McDaniel, and the criminal attack was not reasonably foreseeable. On August 5, 2016, McDaniel filed his response to McCormick's motion for summary judgment. McDaniel maintained that McCormick had a duty to protect McDaniel from Crank's criminal conduct because there was a special

---

[1]In February 2012, the trial court entered a default judgment in favor of McDaniel and against Crank for $235,583.68. Crank is not a party on appeal.

[2]The jury found in favor of Lillian McCormick on McDaniel's negligence claim and she is not a party on appeal.

relationship between McCormick, as a possessor of land, and Crank, who was a licensee upon McCormick's land. McDaniel argued the attack was foreseeable because McCormick was aware of the verbal exchange between Smith and Crank the previous week and of the probability that his guests would become intoxicated and exhibit "bad judgment." On August 12, 2016, the trial court denied McCormick's motion for summary judgment, finding "a duty existed" because Crank and McDaniel were licensees upon McCormick's land. In finding a duty, the court relied upon the abolishment of the common law distinction between invitees and licensees by the Premises Liability Act (740 ILCS 130/1 *et seq*. (West 2010)).[3]

¶ 17    The cause went to trial before a jury in November 2018. During trial, McCormick filed two motions for a directed verdict, reasserting his claim that he had no duty to McDaniel. The first was filed after McDaniel rested his case, and the second was filed at the close of all the evidence. The trial court denied both of McCormick's motions.

¶ 18    The jury returned a verdict in favor of McDaniel and against McCormick. The jury found the amount of damages suffered by McDaniel as a result of the incident was $9000 for pain and suffering. The jury did not award McDaniel any damages for disfigurement, disability, medical expenses, or for the value of time lost. The jury also found McDaniel

---

[3]Section 2 of the Premises Liability Act abolishes the common law distinction between "invitees and licensees as to the duty owed by an owner or occupier of any premises to such entrants." 740 ILCS 130/2 (West 2010). The Act provides that the owner or possessor of land owes such entrants a duty of "reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." 740 ILCS 130/2 (West 2010).

was 5% contributory negligent and reduced the award to $8550 to account for his own negligence.

¶ 19    On November 16, 2018, McDaniel filed a motion for judgment notwithstanding the verdict, a motion for new trial on the issue of damages, and a motion for *additur*. McDaniel asserted the jury's verdict with respect to damages was against the manifest weight of the evidence. McDaniel maintained that the jury's failure to award him medical expenses was likely the result of a mistake or from the jury's improper consideration of payment by a collateral source. On December 11, 2018, McCormick filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, asserting McCormick had no legal duty to control the conduct of Crank or to prevent the criminal attack against McDaniel. On May 7, 2019, McDaniel withdrew his motion for judgment notwithstanding the verdict, conceding that such a motion could not be used to amend the jury's verdict. On May 28, 2019, the trial court entered its order denying McDaniel's motion for new trial and denying McCormick's motion for judgment notwithstanding the verdict. This appeal follows.

¶ 20                                ANALYSIS

¶ 21    On appeal, McDaniel argues the trial court erred in denying his motion for new trial on damages because the jury's verdict awarding damages for his pain and suffering, but not for his medical expenses and lost wages, was "inconsistent, palpably inadequate," and against the manifest weight of the evidence.[4] McCormick cross-appeals, contending the

_____

[4]In his initial brief, McDaniel also argued that the trial court erred in denying his motion for judgment notwithstanding the verdict and in refusing his request to amend the jury verdict by adding

8

trial court erred in denying his motion for judgment notwithstanding the verdict because the evidence did not establish that McCormick had a duty to prevent the criminal attack by Crank, as there was no "special relationship" between the parties, and the attack was not foreseeable. We will address McCormick's cross-appeal first, as it is dispositive of the appeal.

¶ 22    To succeed on a claim of negligence, the plaintiff must prove facts that establish the existence of a duty owed by the defendant to the plaintiff, that the defendant breached his duty, and that, as a proximate cause, the plaintiff suffered damages. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Whether a duty existed is a question of law. *Hills*, 195 Ill. 2d at 228. In determining if a duty existed, the court considers whether a relationship existed between the parties such that the law imposed a legal obligation upon the defendant for the plaintiff's benefit. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436 (2006). This inquiry usually requires the consideration of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Marshall*, 222 Ill. 2d at 436.

¶ 23    As a general rule, one does not have a duty to protect another from the harmful or criminal conduct of a third party or to control the conduct of a third party. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 33; *Hills*, 195 Ill. 2d at 228-29, 242; Restatement

---

$44,861.02 for medical expenses and lost wages to the award. In his reply brief, McDaniel withdrew this point on appeal, acknowledging that he had withdrawn his motion for judgment notwithstanding the verdict in the trial court because the motion cannot be used to increase the amount of damages awarded by the jury.

9

(Second) of Torts § 315 (1965). An affirmative duty to aid or protect another arises only within the context of a legally recognized "special relationship." *Bogenberger*, 2018 IL 120951, ¶ 33; *Hills*, 195 Ill. 2d at 228-29.

¶ 24    Illinois law recognizes two general categories of special relationships: (1) when the defendant and the injured party have a special relationship, and (2) when the defendant and the wrongdoer have a special relationship. See *Bogenberger*, 2018 IL 120951, ¶ 33; *Hills*, 195 Ill. 2d at 228-29, 242; *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 20. When the defendant and the injured party have a special relationship, the defendant has a duty to protect the injured party from the harmful or criminal conduct of a third party. *Bogenberger*, 2018 IL 120951, ¶ 33; *Hills*, 195 Ill. 2d at 242-44. When the defendant and the wrongdoer have a special relationship, the defendant has a duty to control the conduct of wrongdoer to prevent him from harming another. *Hills*, 195 Ill. 2d at 228-29. "Absent a special relationship, there can be no affirmative duty imposed on one for the benefit of another to warn or protect against the criminal conduct of a third party." *Bogenberger*, 2018 IL 120951, ¶ 33.

¶ 25                        Duty to Aid or Protect the Injured Party

¶ 26    There are four special relationships between the defendant and the injured party that give rise to an affirmative duty of the defendant to aid or protect the injured party against an unreasonable risk of physical harm: (1) common carrier and passenger, (2) innkeeper and guest, (3) custodian and ward, and (4) and business invitor and invitee. *Marshall*, 222 Ill. 2d at 438-39; *Hills*, 195 Ill. 2d at 243-44; *Bogenberger*, 2018 IL 120951, ¶ 33. *Wells v. Endicott*, 2013 IL App (5th) 110570, ¶ 48. Of these possibilities, the only special

10

relationship that could potentially exist between McCormick and McDaniel is the fourth option, that of business invitor and invitee. This exception originates from the Restatement (Second) of Torts § 344 (1965) and recognizes the circumstances when a possessor of land may be liable for harm caused to an individual present on the land by the acts of a third party. See *Marshall*, 222 Ill. 2d at 437 ("Under certain circumstances, a possessor of land may be held liable for physical harm caused to an individual present on the land by a condition on the land (Restatement (Second) of Torts §§ 343, 343A (1965)) or by the acts of third persons (Restatement (Second) of Torts § 344 (1965))."). Under this exception, the landholder has a duty to protect lawful entrants from third-party attacks when the possessor of land holds the premises open to the public for entry for business purposes. *Hills*, 195 Ill. 2d at 247-50.

¶ 27   On appeal, McDaniel contends he was a lawful entrant upon McCormick's land, and that McCormick held his property open to the public and permitted the "business" of "horseshoe pitching and beer drinking" to be carried out upon the land. We find this argument to be without merit. There is no evidence in the record that would support a finding that McCormick conducted any business activities on his property, that the social gatherings he hosted were in any way associated with a business McCormick was operating, or that McDaniel was on the McCormick property as a business invitee. Therefore, McCormick and McDaniel did not have a special relationship that gave rise to a duty requiring McCormick to protect McDaniel from the harmful or criminal acts of a third party.

11

¶ 28                    Duty to Control the Conduct of Another

¶ 29    Under the second category of special relationships, when the defendant and the wrongdoer have a special relationship, the defendant has a duty to control the conduct of a wrongdoer to prevent him from causing harm to a third party. *Estate of Johnson v. Condell Memorial Hospital*, 119 Ill. 2d 496, 503-04 (1988); Restatement (Second) of Torts § 315 (1965). These special relationships, as set forth in the Restatement (Second) of Torts §§ 316 through 319 (1965), are (1) parent and minor child; (2) master and servant; (3) possessor of land and licensee; and (4) a person who takes charge of another with dangerous propensities. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 531-32 (1987); *Estate of Johnson*, 119 Ill. 2d at 503-04; *Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 632 (1995); Restatement (Second) of Torts §§ 316-19 (1965).

¶ 30    The Illinois Supreme Court has made general references to this category of special relationships by citing to sections 316 through 319 of the Restatement (Second) of Torts (1965). See *Estate of Johnson*, 119 Ill. 2d at 503-04; *Kirk*, 117 Ill. 2d at 531-32; *Young v. Bryco Arms*, 213 Ill. 2d 433, 452 (2004); and *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552, 558-59 (1975) (acknowledging the defendant may have a duty to protect another from the risk of intentional or criminal conduct under certain circumstances when the defendant has a special relationship with the victim or the wrongdoer as stated in Restatement (Second) of Torts § 315 (1965)). The court has explicitly recognized three of these special relationships can create a duty under Illinois law, to wit: the parent-child relationship, the master-servant relationship, and a person who takes charge of another with dangerous propensities. *Bogenberger*, 2018 IL 120951, ¶ 33; *Simpkins*, 2012 IL 110662, ¶ 20; *Hills*,

12

195 Ill. 2d at 234-41; *Estate of Johnson*, 119 Ill. 2d at 504-09. There is some question among the appellate courts as to whether Illinois recognizes the special relationship set forth in Restatement (Second) of Torts § 318 (1965), which imposes a duty on a possessor of land to control the conduct of a licensee on the land to prevent the licensee's harm to a third party.

¶ 31    The Illinois Supreme Court briefly discussed section 318 in *Teter v. Clemens*, 112 Ill. 2d 252 (1986). In *Teter*, the court affirmed the trial court's dismissal of the plaintiff's complaint seeking to recover for injuries he sustained in a childhood accident at the home of the defendants when the defendants' grandson shot the plaintiff with a pellet gun. *Teter*, 112 Ill. 2d at 255. The plaintiff alleged that the grandson's possession of the pellet gun amounted to a dangerous condition on the defendants' premises, and that the defendants had a duty to warn the plaintiff of the danger or to take adequate precautions against it. *Teter*, 112 Ill. 2d at 256. The court rejected the plaintiff's position that the case involved a condition existing on the land because the injury resulted from the actions of a third party, that being the grandson who found the gun and discharged it. *Teter*, 112 Ill. 2d at 259. The court also summarily rejected the plaintiff's argument that section 318 supported his claim of negligence because the plaintiff failed to allege facts in his petition supporting certain elements of a claim under section 318, specifically whether the defendants were present and whether they permitted their grandson to use the gun. *Teter*, 112 Ill. 2d at 260.

¶ 32    Some courts have taken the position that Illinois has adopted section 318 (*Brewster v. Rush-Presbyterian-St. Luke's Medical Center*, 361 Ill. App. 3d 32, 36-37 (2005); *Cravens v. Inman*, 223 Ill. App. 3d 1059, 1076-77 (1991), *abrogated on other grounds by*

13

*Charles v. Seigfried*, 165 Ill. 2d 482 (1995)), while other courts have rejected this position (*Tilschner v. Spangler*, 409 Ill. App. 3d 988, 990-93 (2011)). In this case, we need not weigh in on the larger debate as to whether Illinois law would, under different circumstances, impose a duty on a landholder to control the harmful or criminal conduct on his licensee.[5] This is for two reasons: (1) Illinois courts have rejected the premise that a landholder has a duty to control the harmful conduct of his social guest, and (2) even if Restatement (Second) of Torts § 318 (1965) is a recognized special relationship in Illinois, McDaniel has failed to establish the restatement elements necessary to prove his claim.

¶ 33    In *Zimring v. Wendrow*, 137 Ill. App. 3d 847, 848-49 (1985), the plaintiff brought a negligence claim against a landowner for injuries he suffered during an attack perpetrated by the landowner's social guests. The plaintiff argued that section 318 imposed a duty upon the defendants to control the use of their land to avoid any foreseeable risk of harm to third parties. *Zimring*, 137 Ill. App. 3d at 850. The court noted that, while section 318 had

---

[5]The comments to section 318 frequently speak in terms of the "use of the land" or of an "activity" being conducted upon the land. Restatement (Second) of Torts § 318 cmts. a, b, and c (1965). Comment c, in particular, discusses situations where a licensee's use of the land creates an unreasonable risk of harm to others, such as when the licensee is conducting a "highly dangerous" activity upon the land. Restatement (Second) of Torts § 318 cmt. c (1965). Courts have looked to section 318 in assessing a landholder's liability for injuries resulting from another's permissive use of or activities upon the land when the landholder is on notice of the potential for injuries. See *S.C. Natural Gas Co. v. Phillips*, 289 F.2d 143, 148 (4th Cir. 1961) (citing section 318 in support of an affirmative duty upon the possessor of land "to see that, in its use by others, hazards and nuisances of which the possessor is aware are not permitted to continue"); *Wilson v. Rancho Sespe*, 24 Cal. Rptr. 296, 300 (Ct. App. 1962) (in an action for damages against a possessor of land resulting from blasting activities being conducted on the property by a third party, the court noted that section 318 provides that a possessor of land may be required to exercise constant vigilance in overseeing any highly dangerous activities that he permits another to conduct upon the land); *Stevens v. City of Pittsburgh*, 194 A. 563, 568 (Pa. Super. Ct. 1937), *opinion adopted*, 198 A. 655 (Pa. 1938) (city, as the owner of the park property, breached its duty to stop the indiscriminate shooting of guns in the park by the city's permittees or invitees, as it was a highly dangerous use of the city's land that would likely cause injury to other persons of which the city had notice and the opportunity to control).

previously been cited by an Illinois court as one of the special relationships giving rise to a duty to control the conduct of a third party, section 318 had not been adopted by any Illinois court.[6] *Zimring*, 137 Ill. App. 3d at 850-51. The *Zimring* court ultimately held that the relationship between a landholder and social guest was insufficient to impose a duty upon a landholder to control the conduct of his guest for the benefit of a third party. *Zimring*, 137 Ill. App. 3d at 852. Over the succeeding decades, the courts have reaffirmed this holding. See *Dearing v. Baumgardner*, 358 Ill. App. 3d 540, 541-42 (2005) (finding landowner had no duty to protect injured social guest from a criminal attack by another social guest because there was no special relationship between the landowner and the injured guest); *Elizondo v. Ramirez*, 324 Ill. App. 3d 67, 73-74 (2001) (rejecting negligence claim against a landowner for criminal act by landowner's social guest). See also *Geimer*, 272 Ill. App. 3d at 633-64 (park district, as landowner, did not have duty to prevent a third party's intentional misconduct because the park district had no unique knowledge regarding the possible future attack); *Barmore v. Elmore*, 83 Ill. App. 3d 1056, 1060-61 (1980) (no evidence the landholder knew or had reason to know of the possibility that his adult son would criminally attack a social guest).

¶ 34 Furthermore, even if Restatement (Second) of Torts § 318 (1965) is a recognized special relationship in Illinois that could give rise to a duty, McDaniel failed to present evidence supporting a finding in his favor on each element of the restatement. Section 318 of the Restatement (Second) of Torts provides:

"Duty of Owner of Land or Chattels to Control Conduct of Licensee

---

[6]*Zimring* predated the Illinois Supreme Court's decision in *Teter*, 112 Ill. 2d 252 (1986).

If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a)     knows or has reason to know that he has the ability to control the third party, and

(b)     knows or should know of the necessity and opportunity for exercising such control."

¶ 35     Here, the evidence does not support a finding that McCormick knew or should have known of "the necessity and opportunity" to exercise control over Crank. The Illinois Supreme Court decision in *Hills*, 195 Ill. 2d 210, is instructive on this issue. In *Hills*, the plaintiff, a little league baseball coach, was injured during an attack by the opposing team's assistant coaches. *Hills*, 195 Ill. 2d at 212. The plaintiff brought suit against his attackers, as well as the organization that hosted the game and Bridgeview Little League Association (Bridgeview), the organization that sponsored the opposing team. *Hills*, 195 Ill. 2d at 212. The evidence at trial indicated that prior to the assault, over the course of several innings, one of the assistant coaches repeatedly swore and yelled at the plaintiff, threatening to " 'com[e] after [the plaintiff]' " and to " 'kick [the plaintiff's] ass.' " *Hills*, 195 Ill. 2d at 212.

¶ 36     In analyzing Bridgeview's liability, the court looked to Restatement (Second) of Torts § 317 (1965), setting forth the master-servant special relationship between a defendant and a wrongdoer which imposes a duty upon the master-defendant to control the conduct of his servant-wrongdoer. *Hills*, 195 Ill. 2d at 229. Similar to section 318,

16

restatement section 317 imposed no duty upon a master to control the intentional harmful conduct of his servant unless he " '(ii) knows or should know of the necessity and opportunity for exercising such control.' " *Hills*, 195 Ill. 2d at 229 (quoting Restatement (Second) of Torts § 317 (1965)). The court found that the plaintiff failed to prove that Bridgeview, through the team manager, knew or should have known "of the necessity and opportunity" to exercise control over the assistant coaches. *Hills*, 195 Ill. 2d at 237-38. Despite the threats to physically assault the plaintiff, the court held that the manager did not have notice that the assistant coaches would intentionally harm the plaintiff because there was no evidence presented that the coaches had any violent propensities, that the coaches had ever committed a previous assault on any person, or that the manager knew that the coaches had any violent tendencies. *Hills*, 195 Ill. 2d at 238. Instead, the evidence presented at trial was that the spectators and the victim did not foresee the attack and were surprised by it. *Hills*, 195 Ill. 2d at 238. The court held there was no basis in the record for holding that the defendant knew or should have known, before the attack began, that the assailants were going to intentionally harm the plaintiff. *Hills*, 195 Ill. 2d at 238.

¶ 37    Here, the evidence of an impending attack during one of McCormick's parties was even less compelling than that in *Hills*. The evidence at trial indicated that prior to this incident, there had been no instances of a physical altercation, of any sort, at one of McCormick's parties in recent years. By the time Crank commenced his attack on Smith, the altercation between Meyers and Smith had ended, and Meyers was walking away. No evidence was presented that anyone, let alone McCormick, knew that Crank had any violent propensities or had ever committed a previous assault on any person. McDaniel,

17

the attendee who was the most familiar with Crank, testified he had been acquainted with Crank for many years and he never knew Crank to exhibit any violent tendencies. McDaniel testified that the attack happened quickly and that he did not anticipate Crank hitting him with the fire poker. McDaniel testified that nothing about the events that evening led him, or would have led anyone else, to anticipate the attack. The evidence in this case simply does not support a finding that McCormick knew, or should have known, of the "necessity and opportunity" to exercise control over Crank prior to the assault. Therefore, McDaniel has failed to demonstrate that McCormick had a duty to control Crank's criminal conduct pursuant to Restatement (Second) of Torts § 318.

¶ 38    Based on the foregoing, we hold that McCormick had no affirmative duty to protect McDaniel from Crank's criminal conduct or to control Crank's criminal conduct, and the trial court erred in denying McCormick's motion for judgment notwithstanding the verdict.[7] In light of this court's resolution of McCormick's cross-appeal, we need not address the issues raised in McDaniel's appeal.

¶ 39                                CONCLUSION

¶ 40    Accordingly, the trial court's order denying McCormick's motion for judgment notwithstanding the verdict is reversed, and the judgment entered in favor of McDaniel and against McCormick for negligence is vacated.

¶ 41    Reversed, and judgment vacated.

---

[7]McCormick's motion to strike McDaniel's supplemental appendix, which was taken with the case, is hereby granted. See Ill. S. Ct. R. 329 (eff. July 1, 2017) (the circuit court clerk shall certify and transmit supplements to the appellate court record).